AMERICAN FEDERATION OF LABOR
AND CONGRESS OF INDUSTRIAL
ORGANIZATIONS et al.

v.

Alfred E. KAHN, Chairman, Council on
Wage and Price Stability, et al.,
Appellants.

No. 79–1564.

United States Court of Appeals,
District of Columbia Circuit.

Argued En Banc June 13, 1979.

Decided June 22, 1979.

As Amended July 2, 1979.

Dissenting Opinion Amended July 2
and Sept. 14, 1979.

Certiorari Denied July 2, 1979.

See 99 S.Ct. 3107.

Benjamin R. Civiletti, Deputy Atty. Gen., Washington, D. C., of the bar of the Supreme Court of Md., pro hac vice, by special leave of court, with whom Barbara Allen Babcock, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., Robert E. Kopp and Burton D. Fretz, Attys., Dept. of Justice, Sally Katzen, Gen. Counsel, Council on Wage and Price Stability, Washington, D. C., and Thomas F. Williamson, Gen. Counsel, Office of Management and Budget, Washington, D. C., were on the brief, for appellants.

Laurence Gold, Washington, D. C., with whom J. Albert Woll, Jerry D. Anker, Winn Newman, Woody Peterson, Thomas X. Dunn, Plato E. Papps, Elliot Bredhoff, Isaac N. Groner, and George Kaufmann, Washington, D. C., were on the brief, for appellees American Federation of Labor and Congress of Industrial Organizations et al.

Laurence Silberman, Washington, D. C., a member of the bar of the Supreme Court of Hawaii, pro hac vice, by special leave of court, for amicus curiae U. S. Senators and Representatives.

Before WRIGHT, Chief Judge, and BA-ZELON, McGOWAN, TAMM, LEVEN-THAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

Opinion for the court, concurred in by Circuit Judges, BAZELON, McGOWAN, TAMM, LEVENTHAL, and SPOTTS-WOOD W. ROBINSON, III, filed by Chief Judge, J. SKELLY WRIGHT.

Concurring opinions filed by Circuit Judges, BAZELON and TAMM.

Dissenting opinions filed by Circuit Judges, MacKINNON and ROBB. Circuit Judge, WILKEY joins in Circuit Judge ROBB's dissenting opinion.

J. SKELLY WRIGHT, Chief Judge:

This case presents the question whether Congress has authorized the President to deny Government contracts above $5 million to companies that fail or refuse to comply with the voluntary wage and price standards. We answer that question in the affirmative.

After presenting the facts of the case, we examine in Part II the authority granted to the President under the Federal Property and Administrative Services Act of 1949 (FPASA or Procurement Act).[1] In Part III we evaluate the contention of appellees, a group of labor unions, that the procurement compliance program is barred by the Council on Wage and Price Stability Act (COWPSA),[2] while in Part IV we review the claim that the program thwarts the national labor policy.

#### I. FACTS

On November 1, 1978 President Carter signed Executive Order 12092 directing the Council on Wage and Price Stability (Council) to establish voluntary wage and price standards for noninflationary behavior for

---

1. 40 U.S.C. § 486(a) (1976).

2. Pub.L.No. 93–387, 88 Stat. 750 (1974), 12 U.S.C. § 1904 note (1976), *as amended*, [1979] U.S.Code Cong. & Admin.News ———.

the entire economy.[3] For a business, the Order stated that noninflationary price increases would be no more than 0.5 percent less than that company's recent rate of average price increase; for workers, noninflationary wage increases were defined as no more than a seven percent annual rise. The President ordered the Chairman of the Council to monitor compliance with these standards and to publish the names of noncomplying companies. The Executive Order also instructed the head of each Executive agency and Military Department to require that all contractors certify that they are in compliance with the wage and price standards. The Office of Federal Procurement Policy (OFPP) was charged with implementation of the procurement aspect of the program. The initial wage and price standards announced by the Council on December 21, 1978 largely followed the outline of the President's November 1 Order,[4] with the added provision that a company may be excepted from compliance in order to "avoid situations o[f] undue hardship or gross inequity." [5]

OFPP issued a policy letter on January 4, 1979, requiring that Government contracts worth more than $5 million and signed after February 15 must include certification that the contractor is in compliance with the wage and price standards.[6] The letter provides that if the Council finds that the standards have not been respected by any such contractor or first-tier subcontractor whose contract exceeds $5 million, the relevant agency head may terminate the contract and the company may be ruled ineligible for future Government business.[7] The policy letter established three grounds for waiving either termination or a finding of ineligibility: (1) if "the product or service is essential to National security or public safety," and there are no feasible alternative sources of supply; (2) if Government action would "threaten the contractor's or subcontractor's ability to survive"; and (3) if the contractor agrees both to comply with the wage and price standards and to make an "equitable" reduction of the contract price.[8] The procurement compliance program is expected to reach 65 to 70 percent of all Government procurement dollars, or about $50 billion worth.[9]

On March 31, 1979 plaintiff labor unions challenged the program in District Court as interfering with the exercise of the right to bargain collectively and as beyond the power of the President to initiate. The District Court granted the unions' motion for summary judgment on the latter ground on May 31, 1979, and enjoined the procurement compliance program.[10] That injunction was

---

3. 43 Fed.Reg. 51375 (1978), *reprinted in* IV Legislative Appendix (Legis.App.) at 29.

4. 43 Fed.Reg. 60772 (1978) (to be codified in 6 C.F.R. § 705), IV–A Legis.App. at 7. Among the exceptions to the general standards program are an optional modified price standard for the wholesale and retail trade industry and the food manufacturing and processing industries, *id.* at 60775, IV–A Legis.App. at 10, and a profit margin limitation standard for companies that have uncontrollable costs or that cannot calculate their average price change. *Id.* at 60774, IV–A Legis.App. at 9.

   Special rules cover health benefits and pension plans under the wage standard. If the cost of maintaining existing health benefits increases by less than 7%, more than a 7% increase may be granted in the other wage components. *Id.* at 60781 (Interpretive Questions and Answers), IV–A Legis.App. at 16. If a pension plan is not amended during the effectiveness of Executive Order 12092 and the benefit structure remains unchanged, the pension

funding costs are excludable from all wage calculations. *Id.*

5. *Id.* at 60775, IV–A Legis.App. at 10. *See also id.* at 60774, IV–A Legis.App. at 9.

6. 44 Fed.Reg. 1229–1230 (1979), IV–A Legis. App. at 19–20.

7. *Id.* at 1230, IV–A Legis.App. at 20. The letter also stated that as the Government gained experience with the compliance program, contracts worth less than $5 million might be included. *Id.*

8. *Id.* at 1231, IV–A Legis.App. at 21.

9. Affidavit of Charles L. Schultze (Chairman of Council of Economic Advisers) at 3, II Appendix (App.) at 438, 440; Affidavit of James D. Currie (Acting Head of OFPP), at 3; III App. at 647, 649.

10. *AFL–CIO v. Kahn,* 472 F.Supp. 88, (D.D.C. 1979). The District Court's opinion in this case

stayed pending the outcome of this expedited appeal.[11]

## II

We note at the outset our disagreement with the contention that this case presents the same issue decided by the Supreme Court in *Youngstown Sheet & Tube Co. v. Sawyer*.[12] In *Youngstown* President Truman argued that he could constitutionally seize and operate the steel mills, which had been closed by a labor dispute, under his "inherent powers" to deal with national emergencies and wartime situations. In arguing for the validity of Executive Order 12092, however, the Government relies entirely upon authority said to be delegated by statute, and makes no appeal to constitutional powers of the Executive that have not been confirmed by legislation. Thus, although both cases involve challenges to Executive actions, they raise sharply different legal questions.[13] Although the separation of powers between Congress and the President was the dominant issue in *Youngstown*, here we primarily face a difficult problem of statutory interpretation. Appellees' challenge to the Executive Order is directed at the procurement aspect of the Order, not at the Council's authority under COWPSA to promulgate voluntary standards.[14] Thus the central issue in this case is whether the FPASA indeed grants to the President the powers he has asserted.

## A

The FPASA was a response to the recommendation of the Hoover Commission in 1949 that the Government's method of doing business be streamlined and modernized.[15] The statute was designed to centralize Government property management and to introduce into the public procurement process the same flexibility that characterizes such transactions in the private sec-

was flawed in several material respects: (1) it concluded that the situation here parallels that in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), *see* p. 787 & n.13 *infra*; (2) it found, without actually examining congressional materials, that the legislative history of the FPASA demonstrated that Congress intended in that Act to prohibit the use of the procurement power to affect general price levels, *see* pp. 787–789 & n.24 *infra*; (3) it neglected the historical uses of the President's powers under the FPASA, *see* pp. 789–792 *infra*; (4) it offered an unlikely interpretation of a key Court of Appeals decision on Executive power under the FPASA, *see* pp. 791–792 & n.40 *infra*; (5) it misunderstood the likely impact of Executive Order 12092 on Government procurement costs, *see* pp. 792–793 *infra*; and (6) it incorrectly viewed this program as "mandatory" within the meaning of COWPSA, *see* p. 794 *infra*.

**11.** Twenty-four senators and members of Congress have filed a brief *amicus curiae* generally in support of appellees.

**12.** *Supra* note 10.

**13.** The contrast between the cases is highlighted by the three-part analysis of Executive powers put forth by Justice Jackson in *Youngstown*:

1. When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum * * *.
* * *

2. When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers * * *. * * *

3. When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb * * *. * * *

343 U.S. at 635–637, 72 S.Ct. at 870–871. The Supreme Court in *Youngstown* held that the seizure of the steel mills might fall in Justice Jackson's second category, but most likely belonged in the third. *See id.* at 602–605, 72 S.Ct. 863 (Frankfurter, J., concurring). But the Government here claims to be within the first category, where the President's power is greatest.

On the constitutional issue of legislative delegation in this case, *see* note 51 *infra*.

**14.** *See AFL–CIO v. Kahn, supra* note 10, 472 F.Supp. at 94.

**15.** The Concluding Report of the Hoover Commission espoused the goal of a "government which will act with dispatch, with greater internal coordination and harmony, with consistency of administrative policy, and economy of operation." *Concluding Report to the Congress by the Commission on Organization of the Executive Branch of Government* at 3 (May 1949).

tor.[16] These goals can be found in the terms "economy" and "efficiency" which appear in the statute and dominate the sparse record of the congressional deliberations.

■ The most important provision of the Act for this case, Section 205(a), provides that the President "may prescribe such policies and directives, *not inconsistent with the provisions of this Act*, as he shall deem necessary *to effectuate the provisions of said Act * * *.*"[17] Because this language is open-ended, it is important to examine its genesis. The initial Hoover Commission study of procurement recommended that a General Services Agency oversee Government acquisitions, and that the Agency be placed within the Executive Office of the President to bolster its authority and to ensure central direction of the bureaucracy.[18] Congress, however, was reluctant to saddle the relatively small Executive Office with such a vast administrative burden, so it set up the General Services Administration as an independent agency.[19] But in response to the Hoover Commission's concern that the strength of the presidency

support the new agency, Congress added Section 205(a) to guarantee that "Presidential policies and directives shall *govern—not merely guide —*" the agencies under the FPASA.[20] We believe that by emphasizing the leadership role of the President in setting Government-wide procurement policy on matters common to all agencies, Congress intended that the President play a direct and active part in supervising the Government's management functions.

To define the President's powers under Section 205(a), some content must be injected into the general phrases "not inconsistent with" the FPASA and "to effectuate the provisions" of the Act. The congressional declaration of policy for the FPASA sets forth the goal of an "economical and efficient system for * * * procurement and supply."[21] Section 201 directs that the Administrator of General Services chart policy and procure supplies in a manner "advantageous to the Government in terms of *economy, efficiency,* or service, and with due regard to the program activities of the agencies concerned."[22] This language rec-

---

**16.** H.R.Rep.No.670, 81st Cong., 1st Sess. 2–5 (1949), I–A Legis.App. at 28–32. The Senate Report refers to the need for an "efficient, business-like system of property management." S.Rep.No.475, 81st Cong., 1st Sess. 1 (1949), I–A Legis.App. at 88. *See* 95 Cong.Rec. 7438, I–A Legis.App. at 131 (remarks of Rep. Brown) (nation needs "sound, businesslike" procurement system); *id.* at 7441, I–A Legis.App. at 134 (remarks of Rep. Holifield). *See also The Organization and Management of Federal Supply Activities, A Report to the Congress by the Commission on Organization of the Executive Branch of Government* at 25–27, 35–37 (Feb. 1949).

**17.** Federal Property and Administrative Services Act of 1949 (FPASA), ch. 288, § 205(a), 63 Stat. 389, codified at 40 U.S.C. § 486(a) (1976) (emphasis added).

**18.** *See Office of General Services, A Report to the Congress by the Commission on Organization of the Executive Branch of the Government* at 1 (Feb. 1949).

**19.** Representative Holifield, the House sponsor of FPASA, pointed out in floor debate that the proposed General Services Administration (GSA) would have about 35,000 employees, while the President's personal staff numbered just over 1,000. To place GSA within the Exec-

utive Office, Holifield argued, would be "ridiculous" and "an unworkable extreme." 95 Cong. Rec. 7441 (1949), I–A Legis.App. at 134.

**20.** *Id.* (remarks of Rep. Holifield) (emphasis added). *See* S.Rep.No.475, *supra* note 16, at 3, I–A Legis.App. at 90. In the words of Representative Bolling:

In drafting this legislation the President was given the power to prescribe policies and directives which he may deem necessary to carry out the provisions thereunder. These policies and directives must govern the action of the Administrator and the executive agencies. This accomplishes for all intents and purposes the same objective that could be obtained by placing the General Services Administration in the Office of the President. 95 Cong.Rec. 7452 (1949), I–A Legis.App. at 145.

**21.** FPASA of 1949, ch. 288, § 2, 63 Stat. 378, codified at 40 U.S.C. § 471 (1976).

**22.** *Id.* § 201(a), codified at 40 U.S.C. § 481(a) (1976) (emphasis added). The words "economy" and "efficiency" echo through the legislative history. *See, e. g.,* H.R.Rep.No.670, *supra* note 16, at 2, 7, I–A Legis.App. at 29, 34; S.Rep.No.475, *supra* note 16, at 6, 8, I–A Legis. App. at 93, 95.

ognizes that the Government generally must have some flexibility to seek the greatest advantage in various situations. "Economy" and "efficiency" are not narrow terms; they encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions. Similar concerns can be seen in the specific direction to contracting officers in Section 303(b) that contracts should be awarded to bidders whose terms "will be most advantageous to the Government, price and other factors considered." [23]

Although the terms and legislative record of the FPASA are not unambiguous, the relationship of the Act to this case can be outlined. Section 205(a) grants the President particularly direct and broad-ranging authority over those larger administrative and management issues that involve the

Government as a whole. And that direct presidential authority should be used in order to achieve a flexible management system capable of making sophisticated judgments in pursuit of economy and efficiency.[24]

### B

In light of the imprecise definition of presidential authority under the FPASA, it is useful to consider how the procurement power has been exercised under the Act. As the Commission on Government Procurement pointed out in its 1972 report, Congress itself has frequently imposed on the procurement process social and economic programs somewhat removed from a strict view of efficiency and economy.[25] More significant for this case, however, several Executive actions taken explicitly or

**23.** 41 U.S.C. § 253(b) (1976). The Armed Services Procurement Act of 1947, whose "principles" were to be applied under FPASA, *see* H.R.Rep.No.670, *supra* note 16, at 6, I–A Legis. App. at 33; S.Rep.No.475, *supra* note 16, at 5, I–A Legis.App. at 92, was also designed to encourage procurement officers to consider "need, quality of product, or lower ultimate cost" as well as price. S.Rep.No.571, 80th Cong., 1st Sess. 2 (1947), I Legis.App. at 42.

**24.** The District Court relied on a report by the General Accounting Office (GAO) for the conclusion that in enacting FPASA Congress specifically did not intend to authorize the President to use the procurement system to regulate prices. *AFL–CIO v. Kahn, supra* note 10, 472 F.Supp. at 94. *See* GAO, *Authority for President's Program Applying Mandatory Wage and Price Standards to Government Procurement (Executive Order 12092)* at 14–18 (Feb. 5, 1979), Supplemental Legis.App. at 80–84. The GAO Report, however, is extremely unreliable on this point. The Report spotlights Representative Holifield's endorsement of granting authority to the proposed GSA to contract with regulated transportation common carriers. 95 Cong.Rec. 8277–8278 (1949), I–A Legis.App. at 176–177. Such authority, Holifield said, would not disrupt the regulation of such carriers by the Interstate Commerce Commission (ICC). There is certainly no basis in those remarks for GAO's conclusion that Congress intended to bar the use of procurement to influence general price levels in the economy. *See* GAO Report, *supra*, at 17, Supp.Legis.App. at 83. Rather, Representative Holifield was addressing one discrete issue—GSA jurisdiction over the purchase of transportation services—and he simply stated the obvious point that such a func-

tion would not intrude on the ICC's regulatory role. The GAO Report also pointed to 40 U.S.C. § 474 (1976), which states that nothing in the FPASA shall "impair or affect" programs of, *inter alia*, "price support" or "stabilization." GAO Report, *supra*, at 18, Supp.Legis.App. at 84. This provision would appear to refer to the farm commodity support programs of the federal government, without any direct relevance for procurement policy generally. Even if it refers to general price control measures, it hardly supports GAO's view. The "no impairment" provision has meant substantial freedom from GSA regulations for affected programs. 1 *Report of Commission on Government Procurement* 17 (1972). Thus the statute prescribes only that procurement shall not *obstruct* stabilization programs, not that procurement policy cannot support such programs.

**25.** For example, the FPASA itself included a directive that a fair portion of Government purchases and contracts be placed with small businesses. Act of June 30, 1949, ch. 288, Title II, § 302, 63 Stat. 393, currently codified at 41 U.S.C. § 252(b) (1976). Other prominent examples enacted since 1949 include directives that Government service contractors meet minimum standards for wages and working conditions, Service Contract Act of 1965, § 2, 41 U.S.C. § 351 (1976), and that the Government not contract with any company that has been found in criminal violation of air pollution standards, Clean Air Amendments of 1970, § 12(a), 42 U.S.C. § 7606 (Supp. I 1977). *See* 1 *Report of the Commission on Government Procurement* 114–115 (1972).

implicitly under Section 205 of the FPASA have also imposed additional considerations on the procurement process.[26] Of course, the President's view of his own authority under a statute is not controlling, but when that view has been acted upon over a substantial period of time without eliciting congressional reversal, it is "entitled to great respect."[27] As the Supreme Court observed this Term, the "construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong."[28]

In February 1964 President Johnson directed by Executive Order that federal contractors not "discriminate [against persons] because of their age except upon the basis of a *bona fide* occupational qualification, retirement plan, or statutory requirement * * *."[29] In order to ease this nation's balance of payments problem in 1967, the General Services Administrator issued a regulation requiring that procurement of materials and supplies for use outside the United States be restricted to goods produced in this country, except when the Government has excess foreign currencies available for purchases overseas.[30] And through Executive Order 11755 in 1973 President Nixon continued in effect the exclusion from employment on federal contract work of certain state prisoners.[31]

Since 1941, though, the most prominent use of the President's authority under the FPASA has been a series of anti-discrimination requirements for Government contractors. The early anti-discrimination orders were issued under the President's war powers and special wartime legislation,[32] but for

26. *See Northeast Construction Co. v. Romney,* 157 U.S.App.D.C. 381, 389–390, 485 F.2d 752, 760–761 (1973).

27. *Board of Governors of the Federal Reserve System v. First Lincolnwood Corp.,* 439 U.S. 234, 248, 99 S.Ct. 505, 513, 58 L.Ed.2d 484 (1978). *See Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

28. *Miller v. Youakim,* 440 U.S. 125, 144 n.25, 99 S.Ct. 957, 59 L.Ed.2d 194 (1979) (quoting *Red Lion Broadcasting Co. v. FCC, supra* note 27, 395 U.S. at 381, 89 S.Ct. 1794 (footnote omitted)).

29. Executive Order 11141, 3 C.F.R. 179 (1964–65 Compilation), *reprinted in* 5 U.S.C. § 3301 note (1976). Although the Order can now be justified under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634 (1976), and the Age Discrimination Act of 1975, 42 U.S.C. §§ 6101–6107 (1976), for the first three years of its operation this Order was apparently based on only the FPASA. The Executive Order itself simply cites "the authority vested in [the President] by the Constitution and statutes of the United States."

30. *See* 32 Fed.Reg. 5622 (1967), *see* 41 C.F.R. § 1–6.8 (1978). This regulation specifically invokes only the 1949 Act as authority (citing 40 U.S.C. § 486(c), *see* 32 Fed.Reg. 5622 (1967). (The Buy American Act, 41 U.S.C. §§ 10a–10d (1976), could not justify the Order since it expressly does not apply to use of goods outside the United States. *Id.* § 10a.)

31. President Nixon's Order derived from Executive Order 325A issued by President Theodore Roosevelt in 1905, which forbade employment of all state prisoners on federal contract work. Roosevelt's Order, in turn, was inspired by the Act of February 23, 1887 (codified at 18 U.S.C. § 436 (1976)), which banned employment of *federal* prisoners by federal contractors. By Act of September 10, 1965, codified at 18 U.S.C. § 4082(c)(2) (1976), the restriction against employment of *federal* prisoners was somewhat relaxed, so President Nixon's Executive Order 11755, 3 C.F.R. 837 (1971–75 Compilation) (1973), made a corresponding change in the way state prisoners would be treated, *see* 41 C.F.R. § 1–12.2 (1978). The only authority claimed for the Nixon Order and the regulations thereunder is the FPASA (specifically, 40 U.S.C. § 486(c) (1976), *see* 39 Fed.Reg. 24009 (1974)). *See also* Executive Order 11598, 3 C.F.R. 565 (1971–75 Compilation) (1971) (requiring that Government contractors list "suitable employment openings with the appropriate office of the State employment service system" in order to encourage employment of returning veterans; claiming only authority of President of the United States).

32. President Franklin Roosevelt issued three Executive Orders dealing with fair employment practices. *See* Executive Order 8802, 3 C.F.R. 957 (1938–43 Compilation) (1941) (citing no specific statutory authority); Executive Order 9001, 3 C.F.R. 1054 (1938–43 Compilation) (1941) (citing Act of Dec. 18, 1941, Pub.L.No. 77–354, ch. 593, 55 Stat. 838); Executive Order 9346, 3 C.F.R. 1280 (1938–43 Compilation) (1943) (apparently premised on President's war powers). President Truman also signed three Executive Orders concerning fair employment practices which continued the policies embod-

the period from 1953 to 1964 only the FPA-SA could have provided statutory support for the Executive action.[33]

The anti-discrimination orders were not tested in the courts until 1964, when the Third Circuit held that they did not grant a private right of action to an employee alleging racial discrimination in work assignment.[34] The court concluded that those orders were a proper exercise of presidential authority under Section 205 of the FPASA and the "declaration of policy" in the Defense Production Act of 1950.[35] In a 1967 ruling on the private cause of action question, the Fifth Circuit observed that the FPASA supported President Kennedy's 1961 Order directing affirmative action by contractors to hire minority workers.

> We would be hesitant to say that the antidiscrimination provisions of Executive Order No. 10925 are so unrelated to the establishment of "an economical and efficient system for  *  *  *  the procurement and supply" of property and

services, 40 U.S.C.A. § 471, that the order should be treated as issued without statutory authority.  *  *  * [36]

After pointing out that the parties did not contest the validity of the Order, the court added, "We, therefore, conclude that Executive Order No. 10925 was issued pursuant to statutory authority, and has the force and effect of law." [37]

The only direct court holding on the validity of the anti-discrimination orders was provoked by a challenge to the "Philadelphia Plan," which required that bidders for federal or federally-assisted construction contracts submit an affirmative action program.[38] In *Contractors Ass'n of Eastern Pennsylvania v. Secretary of Labor*[39] the Court of Appeals rejected a claim that the President exceeded his powers in issuing the affirmative action Order. Judge Gibbons, writing for a unanimous panel, offered several alternative holdings. Although the vitality of two of the claimed bases of decision is subject to question,[40] we

---

ied in President Roosevelt's Orders. *See* Executive Order 9664, 3 C.F.R. 480 (1943–48 Compilation) (1945) (citing no specific statutory authority); Executive Order 10210, 3 C.F.R. 390 (1949–53 Compilation) (1951) (citing Act of Jan. 12, 1951, Pub.L.No. 81–921, ch. 1230, 64 Stat. 1257); Executive Order 10308, 3 C.F.R. 837 (1949–53 Compilation) (1951) (citing Defense Production Act of 1950, Pub.L.No. 81–774, ch. 932, 64 Stat. 798, now codified at 50 U.S.C. App. §§ 2061–2169 (1976)).

**33.** Two Eisenhower Executive Orders and one Kennedy Executive Order substantially continued the anti-discrimination policy, Executive Order 10479, 3 C.F.R. 961 (1949–53 Compilation) (1953); Executive Order 10557, 3 C.F.R. 203 (1954–58 Compilation) (1954); Executive Order 10925, 3 C.F.R. 448 (1959–63 Compilation) (1961), but none of them referred to substantive statutes. President Kennedy extended the anti-discrimination policy to construction contracts, *see* Executive Order 11114, 3 C.F.R. 774 (1959–63 Compilation) (1963), and in 1965 President Johnson transferred enforcement of the policy to the Secretary of Labor, *see* Executive Order 11246, 3 C.F.R. 339 (1964–65 Compilation) (1965). In the early 1970s Congress indicated its approval of the anti-discrimination orders. *See AFL–CIO v. Kahn, supra* note 10, 472 F.Supp. at 97.

**34.** *Farmer v. Philadelphia Electric Co.,* 329 F.2d 3 (3d Cir. 1964).

**35.** *Id.* at 8.

**36.** *Farkas v. Texas Instrument, Inc.,* 375 F.2d 629, 632 n.1 (5th Cir.), *cert. denied,* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967).

**37.** *Id.*

**38.** The Philadelphia Plan regulations, issued by the Secretary of Labor in 1969 for certain projects in a five-county area around Philadelphia, required that contractors set specific goals for utilization of minority manpower in certain crafts. The regulations were based on Executive Order 11246, *supra* note 33.

**39.** 442 F.2d 159, 170 (3d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971).

**40.** Judge Gibbons suggested that, even if the FPASA did not apply, the President acted within his "implied authority," and that the Orders were impliedly ratified when Congress approved appropriations for construction projects covered by the Philadelphia Plan. *Id.* at 171. Unlike the District Court in this case, we find that these portions of Judge Gibbons' opinion are not only of little relevance to the instant case, but also of doubtful force. The Supreme Court has recently criticized the interpretation of appropriations measures as implied approvals of substantive administrative action, *see TVA v. Hill,* 437 U.S. 153, 190, 98 S.Ct. 2279, 57

note as relevant to the instant case his view that the Orders were "authorized by the broad grant of procurement authority" under the FPASA.[41] He stated, "[I]t is in the interest of the United States in all procurement to see that its suppliers are not over the long run increasing its costs and delaying its programs by excluding from the labor pool available minority workmen," and concluded that "[i]n the area of Government procurement Executive authority to impose non-discrimination con✦ tract provisions [represents] action pursuant to the express or implied authorization of Congress." [42]

## C

■ This survey of the terms of the FPASA, its legislative history, and Executive practice since its enactment suggests that the District Court misapprehended the President's statutory powers in this case. Any order based on Section 205(a) must accord with the values of "economy" and "efficiency." Because there is a sufficiently close nexus between those criteria and the procurement compliance program established by Executive Order 12092, we find that program to be authorized by the FPASA.

The District Court was alarmed by the prospect of Government contracts being diverted from low bidders who are not in compliance with the wage and price standards to higher bidders.[43] The result, it might seem, could be an unwarranted drain on the public fisc. Yet it is important to consider the procurement compliance program in its real-world setting. Much Government procurement takes place through the processes of negotiation rather than formal advertisement and competitive bidding. Military procurement, which is the largest single component of Government purchasing, is conducted almost exclusively through negotiated arrangements.[44] In the context of a negotiated contract, the procurement program announced by Executive Order 12092 will likely have the direct and immediate effect of holding down the Government's procurement costs.

Moreover, to the extent that compliance with the wage and price standards is widespread a corresponding reduction (or more gentle increase) in Government expenses should take place.[45] There is every reason to anticipate general compliance throughout the economy. Executive officials have cited initial indications that most large companies will comply with the standards,[46] and the inflation problem is too serious for businessmen and workers not to understand the importance of compliance. In addition, by setting standards for both wages and prices

L.Ed.2d 117 (1978), and much uncertainty attends any claim of "implied" or "inherent" presidential authority under the Constitution.

**41.** 442 F.2d at 170.

**42.** *Id.; see id.* at 171 (anti-discrimination orders not based on "notions of desirable social legislation," but instead involved "the one area in which discrimination in employment was most likely to affect the cost and the progress of [federal] projects * * *.").

**43.** *AFL–CIO v. Kahn, supra* note 10, 472 F.Supp. at 95.

**44.** Bureau of the Census, Statistical Abstract of the United States 1978 at 376 (in 1977, 91.5% of all military procurement, or $41.7 billion worth, was accomplished by negotiated contract rather than through advertising and competitive bidding). Although figures are not available on the portion of nonmilitary procurement taking place through negotiated contracts, the practice is widespread in that area as well.

**45.** *See* Currie Affidavit, *supra* note 9, III App. at 650:

Firms that meet the President's price and pay standards will be reducing their overall rate of increase in costs and prices. By directing procurement toward such firms an incentive will be provided to large numbers of Government suppliers to meet the standards. To the extent that this occurs, the inflationary element in overall Government procurement costs will be lessened, and the cost of procurement reduced.

**46.** *See Adequacy of the Administration's Anti-Inflation Program* (Part I), *Hearings Before a Subcommittee of the House Committee on Government Operations,* 96th Cong., 1st Sess. 293–294 (1979) (testimony of A. Kahn, Chairman, Council on Wage and Price Stability) (hereinafter cited as 1979 Hearings).

Executive Order 12092 attempts to eliminate the need for either business or labor to seek price and wage increases. Finally, if the voluntary restraint program is effective in slowing inflation in the economy as a whole, the Government will face lower costs in the future than it would have otherwise.[47] Such a strategy of seeking the greatest advantage to the Government, both short- and long-term, is entirely consistent with the congressional policies behind the FPASA.[48]

We do not deny that under Executive Order 12092 there may be occasional instances where a low bidder will not be awarded a contract. Nevertheless, we find no basis for rejecting the President's conclusion that any higher costs incurred in those transactions will be more than offset by the advantages gained in negotiated contracts and in those cases where the lowest

bidder is in compliance with the voluntary standards and his bid is lower than it would have been in the absence of standards.[49] Consequently, we conclude that Executive Order 12092 is in accord with the "economy and efficiency" touchstone of the FPASA. By acting to restrain procurement costs across the entire Government, the President was within his Section 205(a) powers.

We wish to emphasize the importance to our ruling today of the nexus between the wage and price standards and likely savings to the Government. As is clear from the terms and history of the statute and from experience with its implementation, our decision today does not write a blank check for the President to fill in at his will.[50] The procurement power must be exercised consistently with the structure and purposes of the statute that delegates that power.[51]

---

47. See Currie Affidavit, *supra* note 9, III App. at 650:

> [O]bservance of the [wage and price] standard[s] by large numbers of individual firms who supply the Government will put competitive pressure on other suppliers to do the same, tending to spread the cost-reducing consequences more broadly across the spectrum of procurement.

48. See text at and note 23 *supra*.

49. "Given that some remedial measure was authorized, the question remaining is whether the measure chosen is reasonably related to its objectives." *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 371, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973).

50. *Amicus* argues that a decision upholding Executive Order 12092 would give the President power, for example, to establish by Executive Order the sort of program proposed in the National Labor Reform Act of 1977, which was not enacted, that "willful" violators of the National Labor Relations Act should be suspended from seeking Government contracts for three years. See H.R. 8410, § 8(3), 95th Cong., 1st Sess. (1977), *printed in Labor Reform Act of 1977 Part I, Hearings Before the Subcommittee on Labor-Management Relations of the House Committee on Education and Labor,* 95th Cong., 1st Sess. 13 (1977). The approach we take today might raise serious questions about the validity of such an Order, but we need not reach that issue here.

51. *Amicus* argues that if the FPASA gives the President authority to adopt the procurement compliance program, the Act must run afoul of

the constitutional prohibition against excessive delegation of legislative power to the President. As articulated by the Supreme Court, the delegation doctrine requires that legislation provide some standards, albeit not necessarily precise or specific ones, by which administrative actions may be judged. See 1 K. Davis, Administrative Law Treatise 149–223 (2d ed. 1978).

The FPASA requires the President to make procurement policy decisions based on considerations of economy and efficiency. Although broad, this standard can be applied generally to the President's actions to determine whether those actions are within the legislative delegation. At a more particular level, administrative standards exist to test the President's actions. Executive Order 12092 specifies percentage increases as standards for judging compliance with the program. Where noncompliance is found, moreover, exceptions to the policy can be granted on the basis of "undue hardship or gross inequity," or if a corporation's survival is at stake. See pp. 785–786 *supra.* These are factual determinations not unlike those reviewed by courts every day. The standards for this program compare favorably with those found sufficient for purposes of judicial review of administrative action in *Amalgamated Meat Cutters & Butcher Workmen v. Connally,* 337 F.Supp. 737, 744–763 (D.D.C.1971) (three-judge court). That the procurement compliance program involves governmental contracting practices would not immunize actions under it from court challenge as arbitrary and capricious or contrary to law. See *M. Steinthal & Co. v. Seamans,* 147 U.S.App.D.C. 221, 230–231, 455 F.2d 1289, 1298–1299 (1971); *Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371,

## III

The District Court concluded that the compliance program involved here was mandatory. As a result, that court found the program barred by this statement in Section 3(b) of COWPSA:

> Nothing in this Act * * * authorizes the continuation, imposition, or reimposition of any mandatory economic controls with respect to prices, rents, wages, salaries, corporate dividends, or any similar transfers[.] [52]

We disagree with the District Court's conclusion. Although every denial of a benefit may be viewed in some sense as a sanction, we do not find in the procurement compliance program those elements of coercion and enforceable legal duty that are commonly understood to be part of any legally mandatory requirement.[53] The situation in this case seems analogous to those federal programs that offer funds to state and local governments on certain conditions. The Supreme Court has upheld such conditional grants, observing on one occasion through Justice Cardozo that "to hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties." [54]

Further, any alleged mandatory character of the procurement program is belied by the principle that no one has a right to a Government contract. As the Supreme Court ruled in *Perkins v. Lukens Steel Co.,* "[T]he Government enjoys the unrestricted power * * * to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." [55] Those wishing to do business with the Government must meet the Government's terms; others need not.

The question presented by this case, however, is not whether in some abstract sense President Carter's program is mandatory or voluntary, but whether it is barred by Section 3(b) of COWPSA. In our view, that provision refers to the sort of mandatory economic controls imposed during World War II, the Korean War, and the early 1970s. The statute covers "prices, rents, wages, salaries, [and] corporate dividends," [56] a likely reference to a similar list in Section 203(a) of the Economic Stabilization Act Amendments of 1971 which established legally enforceable wage and price controls.[57] Because COWPSA was enacted

386, 424 F.2d 859, 874 (1970); *Gonzalez v. Freeman,* 118 U.S.App.D.C. 180, 185–186, 334 F.2d 570, 575–576 (1964).

**52.** 12 U.S.C. § 1904 note (1976). *See AFL–CIO v. Kahn, supra* note 10, 472 F.Supp. at 99–101.

**53.** Mandatory has been defined as "[c]ontaining a command; preceptive; imperative; peremptory." Black's Law Dictionary 1114 (rev. 4th ed. 1968). *Cf. Adams v. Tackett,* 236 Ark. 171, 365 S.W.2d 125 (1963); *State v. Barnell,* 109 Ohio St. 246, 142 N.E. 611 (1924); *Muskego-Norway Consolidated Schools Joint School District No. 9 v. Wisconsin Employment Relations Board,* 32 Wis.2d 478, 145 N.W.2d 680 (1966).

**54.** *Steward Machine Co. v. Davis,* 301 U.S. 548, 589–590, 57 S.Ct. 883, 892, 81 L.Ed. 1279 (1937). In *Steward* the Court upheld as noncoercive a federal statute conditioning tax credits for private employers upon enactment by the state of a federally-approved unemployment compensation law. *See Oklahoma v. United States Civil Service Comm'n,* 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947); *City of New York v. Richardson,* 473 F.2d 923 (2d Cir.), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973); *State of North Carolina ex rel. Morrow v. Califano,* 445 F.Supp. 532

(E.D.N.C.1977) (three-judge court), *aff'd,* 435 U.S. 962, 98 S.Ct. 1597, 56 L.Ed.2d 54 (1978); *Dupler v. City of Portland,* 421 F.Supp. 1314 (D.Me.1976).

**55.** 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108 (1940). Although the holding in *Perkins* that contractors lack standing to challenge arbitrary contracting decisions has withered, *see Scanwell Laboratories, Inc. v. Shaffer, supra* note 51, nothing has undercut the *Perkins* Court's view of the Government's contracting power. *United States Brewers Ass'n, Inc. v. EPA,* 600 F.2d 974, 984 (D.C.Cir.1979). *See United States v. New Orleans Public Service, Inc.,* 553 F.2d 459, 469 (5th Cir. 1977), *vacated on other grounds,* 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978); *Southern Illinois Builders Ass'n v. Ogilvie,* 327 F.Supp. 1154, 1161 (S.D.Ill.1971), *aff'd,* 471 F.2d 680 (7th Cir. 1972).

**56.** Pub.L.No. 93–387, § 3(b), 88 Stat. 751 (1974), III Legis.App. at 2, codified at 12 U.S.C. § 1904 note (1976).

**57.** Pub.L.No. 92–210, § 203, 85 Stat. 744 (1971), II Legis.App. at 8. Under the Economic Stabilization Act Amendments, economic controls

just a few months after the Economic Stabilization Act expired, it is reasonable to conclude that the language of Section 3(b) looks back to the provisions of the earlier Act. In addition, the standards in Executive Order 12092, which cover only wages and prices, are not as extensive as the list in Section 3(b). Consequently, we do not think the procurement compliance program falls within the coverage of Section 3(b), but rather is a halfway measure outside the contemplation of Congress in that enactment. This interpretation is reinforced by the fact that Executive Order 12092, unlike the earlier wage and price programs, makes no provision for civil or criminal penalties or injunctions.

Perhaps more important, Section 3(b) is irrelevant to the President's procurement compliance program. The statutory provision states that "[n]othing in *this* Act * * authorizes * * * mandatory economic controls" (emphasis added). Executive Order 12092 relies on COWPSA for the Council's power to establish the voluntary wage and price standards, but the Order rests on the FPASA for implementation of the procurement compliance program. Since we think the procurement feature of the President's Order is supported by FPASA, it is of no concern that Section 3(b) may not also grant him that authority.[58]

Finally, it is important to point out that just two months ago the Congress approved a one-year extension of COWPSA, a tripling of its budget, and a sixfold increase in its staff.[59] The legislative history of this 1979 extension of COWPSA, which was approved while this suit was pending in the District Court, contains several assertions that Congress did not intend to make any statement on the issues raised in this case.[60] Yet it strains credulity to maintain that

could be enforced by criminal penalty, civil fine, injunction, or private treble damage action.

**58.** We are also not persuaded that the President's program is barred by the Moore Amendment of 1946 to the Second War Powers Act, Act of June 29, 1946, ch. 526, § 2, 60 Stat. 346, 50 U.S.C.App. § 645b (1976), as suggested by appellees. The amendment states:

Nothing contained in this Act [the Second War Powers Act] or any other federal Act * * * shall be construed to authorize the establishment by any officer or agency of the Government of maximum prices for any commodity or maximum rents for any housing accommodations.

The statute prohibits only the "establishment * * * of maximum prices for any commodity." President Carter has not established any maximum prices, but has only restricted Government contracting to those firms in compliance with voluntary standards. In addition, because the language of the Amendment refers directly to language used in legislation establishing wage and price controls during World War II, *see, e.g.*, Emergency Price Control Act of 1942, §§ 2, 205, Pub.L.No. 77–421, 56 Stat. 24–27, 33–35; Act of Oct. 2, 1942, Pub.L.No. 77–729, 56 Stat. 765, 766, we think the Moore Amendment bans only that sort of mandatory control. Finally, the legislative history of this section suggests that Congress intended the phrase "any other federal Act" to refer to *then-existing* acts, not laws subsequently enacted. *See* 92 Cong.Rec. 7872 (June 28, 1946) (statement of Senator Joseph O'Mahoney, Manager of the Senate bill) ("[t]he purpose of the amendment was to make certain that none of the *war powers* should be used for the purpose of carrying into effect any of the powers granted by the Price Control Act [and] the Stabilization Act") (emphasis added).

**59.** *See* 125 Cong.Rec. H1545–H1546 (daily ed. March 21, 1979); *id.* at S3769 (daily ed. April 2, 1979); *id.* at H2324–H2325 (daily ed. April 25, 1979); *id.* at S4759 (daily ed. April 26, 1979), III–C Legis.App. at 92–93, 143, 145. The terms of the 1979 extension are set out in H.R. Rep.No. 96–33, 96th Cong., 1st Sess. 12–13 (1979), and the Conference Report, H.R. Rep.No. 96–93, 96th Cong., 1st Sess. 1–2 (1979).

In September 1978, before the President's program was announced, the Senate approved a "Sense of the Senate" resolution stating that neither the FPASA nor any other statute empowered the President to impose mandatory economic controls. 124 Cong.Rec. S16781 (daily ed. Sept. 30, 1978). The resolution, however, has no force of law, predates the President's program, and, most important, is not applicable to the nonmandatory program that we review today.

**60.** *See, e.g.,* H.R.Rep.No. 96–33, *supra* note 59, at 3, III–C Legis.App. at 8 (committee "did not seek to resolve" controversy "on the issue of whether the Executive * * * has exceeded the authority granted by Congress"); 125 Cong.Rec. H2322 (daily ed. April 25, 1979), III–C Legis.App. at 95 (remarks of Rep. Moorhead).

COWPSA bars the procurement compliance program when Congress has just extended that statute knowing that the Council it established is charged with implementing the wage and price guidelines on which the procurement program is based.[61] Congress can reverse incorrect Executive interpretations of its statutes and has used that power in the past.[62] Congress, fully aware of the procurement program, renewed COWPSA without significant modification. In this context, a court could only in the most extreme case find that the Executive has violated the statute.

### IV

■ Appellees also argue that Executive Order 12092 contravenes the policy of free collective bargaining embodied in the National Labor Relations and Railway Labor Acts. Although the Executive Order represents an important external factor in the economic environment surrounding collective bargaining, it does not subvert the integrity of that process.[63] Accordingly, we find this contention to be without merit.

### V

The people of this country are experiencing a cruel period of economic inflation. In an effort to relieve the distress caused by that inflation, Congress has authorized the President to issue wage and price standards and to encourage voluntary compliance as an act of good citizenship.[64] The President has pursued this goal through his statutory authority over Government procurement. Given this cooperative effort by the legislative and executive branches of our government, it would be ironic indeed for the third branch to ignore the legal basis for the program challenged here and hold that the President may not deny Government contracts above $5 million to those who flout the voluntary standards.

Consequently, the order of the District Court is reversed and its injunction is vacated.[65]

*So ordered.*

BAZELON, Circuit Judge, concurring:

I concur in Judge Wright's careful analysis of the statutory authority for Executive Order 12092. I write only to emphasize the

---

**61.** In fact, the final version of the 1979 extension acknowledges that the Council will be "determin[ing] compliance with promulgated standards." *See* H.R.Rep.No. 96–93, *supra* note 59, at 1, III–C Legis.App. at 1. Other factors indicate that Congress well understood the Council's role in the procurement compliance program. Administration officials made no secret of the fact that some of the additional funding for the Council would go to the contract compliance aspect of the Council's mission. *See* 1979 Hearings, *supra* note 46, at 291–294 (testimony of A. Kahn, Chairman, Council on Wage and Price Stability). And in an exchange with Senator Heinz in floor debate Senator Proxmire, a sponsor of the measure, assured his colleague that if the courts found that the procurement compliance program was illegal, Congress could "reduce the personnel assigned to the agency." 125 Cong.Rec. S3745 (daily ed. April 2, 1979), III–C Legis.App. at 119. In view of these indications, and the pervasive public attention directed to the procurement program in recent months, we have no concern that Congress as a whole was not aware of the intimate relationship between the 1979 extension and the procurement program. *See SEC v. Sloan*, 436 U.S. 103, 120–122, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978).

**62.** For example, the Motor Vehicle and Schoolbus Safety Amendments of 1974 reversed the requirement of the Secretary of Transportation that automobile ignitions not function until passengers put on their seatbelts. Pub.L.No. 93–492, § 109, 88 Stat. 1482 (codified at 15 U.S.C. § 1410b (1976)).

**63.** *Contractors Ass'n of Eastern Pennsylvania v. Secretary of Labor, supra* note 39, 442 F.2d at 174–175. *See Amalgamated Meat Cutters & Butcher Workmen v. Connally, supra* note 51, 337 F.Supp. at 763–764.

**64.** *See* note 61 *supra.*

**65.** We note our disagreement with the view taken by Judge MacKinnon in his lengthy dissent as to the role of Congress with respect to this case. We do not think it without any significance at all that the FPASA has not been revised in reaction to Executive Orders by Presidents Eisenhower, Kennedy, Johnson, and Nixon that explicitly or implicitly relied on the statute, and which deployed the procurement power in pursuit of ends that might not strictly be defined as economy or efficiency. *See* Part II–B *supra*; MacKinnon dissent at 870.

close nexus between the Order and the objectives of the Procurement Act, and to underscore my understanding that nothing in the court's opinion intimates any views on the validity of other Executive Orders issued explicitly or implicitly pursuant to the authority granted by the Procurement Act in general, or by § 205(a) of that statute in particular.

TAMM, Circuit Judge, concurring:

I concur in Judge Wright's opinion for the court. Lest we later be construed as having broadly interpreted the Procurement Act, I write separately only to emphasize my belief that the opinion we issue today is a narrow one. It does not allow the President to exercise powers that reach beyond the Act's express provisions. In my view, the decision to uphold Executive Order 12092 is predicated upon the close nexus between the purpose of the voluntary guidelines and the goal of the Act to secure economy and efficiency in federal procurement.

MacKINNON, Circuit Judge, dissenting:

In 1949 Congress enacted the Federal Property and Administrative Services Act for the stated purpose of "simplify[ing] the procurement, utilization, and disposal of Government property" and "reorganiz[ing] certain agencies of the Government." Act of June 30, 1949, chap. 288, 63 Stat. 377. Section 205(a) of this "1949 Act" grants the President the power to "prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act." 40 U.S.C. § 486(a) (1976). Today the majority, with two tepid separate concurrences, holds that the President can invoke this power to require adherence to a national system of wage and price standards as a condition of doing business with the federal government. The majority achieves this result despite the fact that the President's action is inconsistent with explicit provisions of the 1949 Act and is unrelated to the congressional purpose underlying it. I can find no license in the President's important but modest powers under the 1949 Act to support his imposition of wage and price controls on federal government contractors. Moreover, I believe that were the majority's construction of section 205(a) correct, then the 1949 Act would amount to an unconstitutional delegation of legislative authority to the executive branch. Accordingly, I dissent.

A. *Preliminary Considerations*

My views do not disagree with the majority's statement that this case presents an issue different from that decided in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), though I believe that decision has some pertinence to our analysis here, and certainly far more than the majority acknowledges. In *Youngstown,* the President issued an executive order directing the Secretary of Commerce to seize control of and to operate the Nation's steel mills in order to avert a nationwide strike which the President feared would jeopardize national defense efforts during the Korean Crisis. The President also ordered the Secretary to prescribe the terms and conditions of employment under which the mills were to be operated, and empowered him to promulgate any regulations and orders necessary to carry out the executive order. The steel companies challenged the President's order on the ground that he lacked the authority to issue it. The district court tentatively agreed and preliminarily enjoined the Secretary from enforcing it. 103 F.Supp. 569, 573–77 (D.D.C.1952). This court stayed the injunction. 90 U.S.App.D.C. 416, 418–19, 197 F.2d 582, 584–85 (1952) (en banc). On certiorari, the Supreme Court affirmed the judgment of the district court. 343 U.S. at 589, 72 S.Ct. 863.

Justice Black's opinion for the Court began with the observation that "[t]he President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Id.* at 585, 72 S.Ct. at 866. The President specifically disclaimed reliance on any statutory authority, and the Court found none to support his action. Indeed, the Court said, five years

earlier Congress had expressly declined to grant the President the power he now claimed. *Id.* at 586, 72 S.Ct. 863. The legality of the steel mill seizure, then, turned on whether some constitutional provision authorized the President to act as he did. The Court held that the Constitution contained no such reservoir of presidential power.

'Basic to the *Youngstown* Court's reasoning was the character of the power the President had sought to exercise. The structure of our constitutional system places the legislative power—that is, the power to make law—in Congress, while the President is charged with executing the laws so made. Had the President merely been carrying out an otherwise lawful legislative directive when he ordered the seizure of the mills, his action could not have been challenged on the ground that he lacked the authority to act. The defect in the President's action in *Youngstown* was his attempt to exercise legislative power where none had been lawfully delegated. Justice Black's opinion explained:

> The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President. The preamble of the order itself, like that of many statutes, sets out the reasons why the President believes certain policies should be adopted, proclaims these policies as rules of conduct to be followed, and again, like a statute, authorizes a government official to promulgate additional rules and regulations consistent with the policy proclaimed and needed to carry that policy into execution. The power of Congress to adopt such public policies as those proclaimed by the order is beyond question. It can authorize the taking of private property for public use. It can make laws regulating the relationships between employers and employees, prescribing rules designed to settle labor disputes, and fixing wages and working conditions in certain fields of our economy. The Constitution does not subject this law-making power of

Congress to presidential or military supervision or control.

Id. at 588, 72 S.Ct. at 867.

Executive Order 12092, in issue here, does not direct that a congressional policy be executed in a manner prescribed by Congress. Instead, exhibiting what is essentially legislative power, it directs that a presidential policy be executed in a manner prescribed by the President. The preamble of the order, like that of many statutes, sets out the reasons why the President believes the wage and price guidelines are necessary, proclaims these standards as rules of conduct to be followed by federal government procurement officers, and again, like a statute, authorizes a government official to promulgate additional rules and regulations consistent with the policy proclaimed and needed to carry the policy into execution.

The power of Congress to adopt such public policies as those proclaimed in Executive Order 12092 is beyond question. Congress and Congress alone has the constitutional authority to direct that adherence to wage and price controls be a mandatory condition of doing business with the federal government. The Constitution does not prevent Congress from delegating this legislative power to the President within limits. *See Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 305, 53 S.Ct. 350, 77 L.Ed. 796 (1933). The question in this case is whether through the vehicle of the 1949 Act Congress intended to delegate to the President the power to establish compliance with wage and price controls as a condition of doing business with the federal government. If Congress intended to do so, and did so in conformity with constitutional principles, then the President's action must stand. If Congress did not intend to delegate that authority, or purported to delegate it without constitutionally sufficient standards then the President's action amounts to law-making in violation of Article I of the Constitution.

Thus the question is indeed initially one of statutory interpretation. There are well established rules to govern judicial interpre-

tation of statutes. One axiom is that the intent of Congress governs interpretation of the statute. *See Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1961); *Jay v. Boyd,* 351 U.S. 345, 357, 76 S.Ct. 919, 100 L.Ed. 1242 (1956). The ambit of a delegated power is controlled by the purposes of the statute which delegates it. *See Mastro Plastics Corp. v. National Labor Relations Board,* 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956); *Addison v. Holly Hill Fruit Products, Inc.,* 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944). Another vitally important rule is that when one among alternative constructions would involve serious constitutional difficulties, a court should construe the statute to avoid these difficulties. *See National Cable Television, Inc. v. United States,* 415 U.S. 336, 342, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974); *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *In re Evans,* 146 U.S.App. D.C. 310, 314, 452 F.2d 1239, 1243 (1971); 2A C. Sands, *Sutherland Statutory Construction* § 45.11 (4th ed. 1973). This elementary principle of statutory interpretation counsels a narrow reading of a congressional enactment when a broader construction would endanger the statute's constitutionality.

The implications of these rules for this case are clear. This court must identify the congressional purpose in enacting the 1949 Act and define the President's power under section 205(a) with reference to that purpose. It must also construe the President's power under section 205(a) in a manner consistent with the constitutional doctrine circumscribing the means by which Congress can delegate legislative authority to executive officers. In my judgment, the majority's opinion not only flouts the intent Congress expressed in enacting the 1949 Act, but it also ignores the constitutional limits on Congress' power to delegate its lawmaking prerogatives.

B. *Executive Order 12092 and the Purposes of the 1949 Act*

1. The Scope of Section 205(a) of the 1949 Act

It is no accident that the majority opinion cannot point to any legislative history of the 1949 Act to justify its holding that the President can use his procurement power to control wage and prices of federal government contractors, for there is not a single passage in that history—not even an off-hand remark—remotely supporting the use of the procurement power to achieve non-procurement objectives. Congress did not enact the 1949 Act to give the President an unguided instrument with which to establish price and wage controls on business which have no bearing on federal government procurement needs. The problem faced by the Government in 1949 was the disorderly administration of mammoth federal supply operations that were uncoordinated, duplicative, and without rational procedures. The legislative history of the 1949 Act is replete with indications of congressional concern about the absence of central management of the federal government's purchasing and property maintenance mechanisms, with all the attendant inefficiencies. *See, e. g.,* S.Rep.No. 475, 81st Cong., 1st Sess., 1–6, 8 (1949); H.R.Rep.No. 670, 81st Cong., 1st Sess. 2–7 (1949); 95 Cong.Rec. 7441–43 (1949) (remarks of Rep. Holifield). It is in the context of these problems, and these problems alone, that the 1949 Act must be read.

In response to these problems, Congress created the General Services Administration and coordinated the procurement and management of federal government property under that new agency. In Title II of the statute, under the heading of "Property Management," section 201(a) provides that the Administrator shall prescribe policies and procedures relating to "procurement, warehousing, and related activities" to the extent he determined "that so doing is advantageous to the Government in terms of *economy, efficiency, or service.*" Act of June 30, 1949, chap. 288, § 201, 63 Stat. 383 (codified at 40 U.S.C. § 481(a) (1976)) (emphasis added). In this same title, Congress delegated to the President the authority to "govern" the Administrator's decisions with policies of his own. *Id.* § 205(a), 63 Stat. 389 (codified at 40 U.S.C. § 486(a) (1976)).

It is clear from these provisions and from the context in which they appear that Congress intended to provide the President with the significant but comparatively narrow authority to manage the procurement of federal government property, supplies, and services. As the House sponsor of the 1949 Act explained, the "key" to the new property management scheme was the Administrator's power in section 201 to provide for a "uniform yet flexible system—Government-wide—for procurement, warehousing, property identification, supply, traffic management, and management of public utility services." 95 Cong.Rec. 7442 (1949) (remarks of Rep. Holifield). It was the *uniformity* of policies and procedures that was "absolutely essential to achieve economy, efficiency, and substantial savings." *Id.* Congress was not reordering the national economy in an effort to save money; it was cleaning out the government's house, fashioning the government's procurement and property management system in accordance with sound business principles. S.Rep.No. 475, *supra,* at 1.

Consistent with sound business principles, Congress wanted to ensure uniformity in procurement decisions and to clarify the chain of command. Therein lies the sole purpose of section 205(a). Congress intended to avoid any implications that the General Services Administration was an independent administrative agency free from direct presidential control. It wanted to vest the President with the ultimate authority to control procurement policy while giving the General Services Administration the day-to-day responsibility for managing federal government property. 95 Cong.Rec. 7441 (1949) (remarks of Rep. Holifield); *id.* at 7452 (remarks of Rep. Bolling). It certainly did not envision the General Services Administration or any other federal government procurement office acting as a kind of partner to the Federal Reserve Board in managing the Nation's economic affairs, and *a fortiori* it did not intend the President to use his procurement oversight powers as an instrument to that effect. Section 205(a) merely permits the President to oversee and to promulgate policies relating to procurement, warehousing, property identification, supply, traffic management, and the like. As long as the President prescribes policies and directives bearing an actual and logical relationship to these items of property management, he lawfully exercises his powers under section 205(a).

Executive Order 12092, which professes to rest exclusively on this moderate power, is a general nationwide edict that materially affects the entire economy of the United States. *See* 43 Fed.Reg. 51375 (1978), *reprinted in* Appendix. The purpose of this Order is not to streamline federal government procurement. It is not to ensure the efficient management of government property. It is not to guarantee that the government receives the best possible product at the lowest possible cost. It is not to regulate the operations of the federal government's various purchasing entities. While the Order deals with federal government procurement, its aims are unrelated to any pressing procurement need. Although the Order's impact is in large measure uniform, uniformity itself is not the supposed advantage in terms of "economy and efficiency." Rather the Order is an attempt to grapple with the admittedly obstinate problem of inflation, and to do so through *sub rosa* controls of wages and prices. However noble that effort may seem, the 1949 Act contains no warrant for using the procurement process as a tool for controlling the Nation's economy. Presidential attempts to handle inflation must occur within a framework of powers provided by Congress and the Constitution. There may be several ways to skin a cat, but the President here has reached into an arsenal Congress did not provide for that purpose to unsheathe a knife designed for and restricted to more limited chores.

2. The Consistency of Executive Order 12092 with Other Provisions of the 1949 Act.

Not only is the President's action well beyond the congressionally-intended scope of power conferred on him by section 205(a), but it is also inconsistent with other

provisions of the 1949 Act. Whether or not section 205(a) allows the President to pursue nonprocurement objectives through the procurement process, under the express terms of that section he may only act in a fashion "not inconsistent with the provisions of this [1949] Act." 40 U.S.C. § 486(a) (1976). Hence any inconsistency between Executive Order 12092 and the 1949 Act is fatal to the presidential action. In this case, Executive Order 12092 is inconsistent with the 1949 Act in at least three respects.

a. *Section 502(d)*—The President's Order is inconsistent with section 502(d) of the 1949 Act. That provision states:

> *Nothing* in this [1949] Act *shall impair or affect any authority of*
>
> .      .      .      .      .
>
> (2) *any executive agency with respect to any phase (including,* but not limited to, *procurement,* storage, transportation, processing, and disposal) *of any program conducted for purposes of* resale, price supports, grants to farmers, *stabilization,* transfer to foreign governments, or foreign aid, relief, or rehabilitation: Provided, That the agency carrying out such program shall, to the maximum extent practicable, consistent with the fulfillment of the purposes of the program and the effective and efficient conduct of its business, coordinate its operations with the requirements of [said chapters] and the policies and regulations prescribed pursuant thereto.

Act of June 30, 1949, chap. 288, § 502(d), 63 Stat. 401 (codified at 40 U.S.C. § 474 (1976)) (emphasis added). The unmistakable import of this language is that the 1949 Act was *not* intended to expand (or for that matter diminish) the President's power to accomplish price and wage stabilization. The President's power, if any, to bring about price and wage stabilization must stem from an act of Congress. Congress has not granted the President that power, and section 502(d) denies the President the power under section 205(a) to use the procurement process to stabilize wages and prices. Yet that is precisely what the President seeks to do in Executive Order 12092.

The majority rejects this inconsistency on two grounds. It first claims that the term "stabilization" was only meant to "refer to the farm commodity support programs of the federal government, without any direct relevance to procurement policy generally." Maj.Op. at p. 789 n.24. This reasoning ignores the use of the word "procurement" in section 502(d), and also fails to heed the common understanding of the word "stabilization." The majority cites no support for its novel interpretation, and of course there is none either in the text of section 502(d)—which lists matters well beyond "farm commodity support programs"—or in the legislative history. Having enacted some form of wage and price stabilization program to govern most of the decade of the 1940's, Congress was well aware of what the word "stabilization" meant. *See, e. g.,* Emergency Price Control Act of 1942, Pub.L.No. 421, 56 Stat. 23; Act of July 25, 1946, Pub.L.No. 548, 60 Stat. 664.

Acknowledging that "stabilization" could indeed refer to price and wage controls, the majority next offers the disingenuous suggestion that section 502(d) "prescribes only that procurement shall not *obstruct* stabilization programs." Maj.Op. at p. 789 n.24. Where? The statute itself says that nothing in the 1949 Act shall "impair or *affect*" stabilization programs. 40 U.S.C. § 474 (1976) (emphasis added). One might be inclined to agree with the majority's reading if only the first of these two words appeared in section 502(d), but that is not the case. There is simply no basis for converting the verb "affect" into the verb "obstruct." The dictionary defines "to affect" as "to produce an effect upon" or "to produce a material influence upon or alteration in." *Webster's New Collegiate Dictionary* 19 (1977). It is fundamental that the plain and ordinary meaning of statutory language controls. *See* 2A C. Sands, *supra* § 45.08 at 24. Section 502(d) provides that nothing in the 1949 Act shall *produce an effect upon,* influence, or alter any stabilization program. The President's Order is in violation of that prohibition, and it is therefore unlawful.

b. *Section 303(b)*—Executive Order 12092 is also inconsistent with section 303(b) of the 1949 Act. That provision states in pertinent part:

Award [of all bids] shall be made with reasonable promptness by written notice to the responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the Government, price and other factors considered.

Act of June 30, 1949, chap. 288, § 303(b), 63 Stat. 395 (codified at 41 U.S.C. § 253(b) (1976)). This provision, like every other provision of the statute, must be read in the context from which it derives. That context indicates that Congress intended federal government procurement officers to consider, in addition to price, such factors as the quality of the goods, their suitability for government purposes, and the general availability of those goods in the market. The majority does not disagree. *See* Maj.Op. at 789. Each of these factors makes sense in the procurement setting. When a purchaser is looking for goods and services to meet special needs, and particularly when he is dealing in the kind of volume the federal government requires, price alone will not in every case dictate buying behavior. Congress recognized that procurement officers had to have some measure of flexibility. *See* 95 Cong.Rec. 7442 (1949) (remarks of Rep. Holifield). But that does not mean that Congress intended federal government procurement officers to consider factors completely extraneous to the procurement setting. Indeed in that setting the very essence of the concepts of "economy" and "efficiency," which as the majority notes are the concepts that dominated the congressional discussion of the 1949 Act, operate to confine consideration to those factors having some relevance to the price of the good, its quality, and its suitability for government purposes.

The extent of the majority's treatment of this question is worth repeating here. It is as follows:

"Economy" and "efficiency" are not narrow terms; they encompass factors like price, quality, suitability, and availability of goods and services that are involved in all acquisition decisions. Similar concerns can be seen in the specific direction to contracting officers in Section 303(b) that contracts should be awarded to bidders whose terms "will be most advantageous to the Government, price and other factors considered."

Maj.Op. at 789 (quoting 40 U.S.C. § 471 (1976))(footnote omitted). This much is fine. Previous to this the majority had emphasized the importance of giving some content to the terms "economy" and "efficiency," and in this quoted passage it appears to be doing so by focusing on factors like the quality of the good and its suitability for government purposes. This is turn would seem to belie the existence of any power to order disregard of these factors in favor of other nonprocurement considerations.

Immediately following the quoted passage, however, the majority concludes:

Although the terms and legislative record of the [1949 Act] are not unambiguous, the relationship of the Act to this case can be outlined. Section 205(a) grants the President particularly direct and broad-ranging authority over those larger administrative and management issues that involve the Government as a whole. And that direct presidential authority should be used in order to achieve a flexible management system capable of making sophisticated judgments in pursuit of economy and efficiency.

*Id.* at 789. It is on this basis that the majority proceeds to hold that Executive Order 12092 is a lawful exercise of the President's section 205(a) power. Yet it immediately follows and draws its support from a statement that the concepts of "economy" and "efficiency" permit consideration of procurement-directed factors like price and quality, not factors like wage and price guidelines that are unrelated to the price and the quality of a good in any given setting. Having given the governing concepts a content restricted to procurement purposes, the majority contradicts that content by extending the President's power to

act in a manner unrelated to the content the majority describes.

The majority elsewhere notes that Congress has in times past imported nonprocurement goals into procurement decisions, Maj.Op. at 789; *see, e. g.,* 41 U.S.C. § 252(b) (1976), and doubtlessly *Congress* has the power to do so. But the President is not Congress. Our concern is not with what the legislature may do in the exercise of its lawmaking powers, but with what the President may do in exercising restricted delegated authority. The only value in noting what Congress has done to expand the range of factors that may enter into procurement decisions lies in the recognition that when Congress intends to have nonprocurement objectives considered, it will enact positive law dictating precisely what objectives *it* wants pursued.

c. *Section 303(a)*—Finally, the President's Order is inconsistent with section 303(a) of the 1949 Act. The majority completely ignores this provision, and the text of the section reveals why:

> The advertisement for bids shall be made a sufficient time previous to the purchase or contract, and specifications and invitations for bids shall permit such *full and free competition* as is consistent with the procurement of types of supplies and services necessary to meet the requirements of the agency concerned.

Act of June 30, 1949, chap. 288, § 303(a), 63 Stat. 395 (codified at 40 U.S.C. § 253(a) (1976)) (emphasis added). Except for the substitution of the word "property" for the word "supplies" that Congress made by Act of July 12, 1952, chap. 703, 66 Stat. 594, this quoted portion of section 303 remains unchanged since the adoption of the 1949 Act. It therefore continues to express Congress' determination that there shall be *"full and free competition"* for federal government procurement contracts. Whatever else Executive Order 12092 may do, it plainly does not permit full and free competition among businesses wishing to obtain federal procurement contracts. Indeed it is the very antithesis of that congressional command, for it restricts such competition on the basis of what everyone concedes are arbitrary wage and price guidelines. The concept of full and free competition presupposes the existence of free market forces. It is apparent from the statute that Congress envisioned the federal government purchasing its goods and services at fair market value, and that the 1949 Act was fashioned to ensure that the federal government's purchasing decisions were economical and efficient within the market structure. The President's attempt to bludgeon the market for government contracts is completely foreign to the expressed legislative intent.

C. *The Majority's "Close Nexus" Test*

To my mind the sharp divergence between the purposes of the 1949 Act and the character of the authority the President seeks to exercise pursuant to section 205(a) renders clear the invalidity of Executive Order 12092. Additionally, any of the foregoing inconsistencies between the explicit terms of the 1949 Act and Executive Order 12092 provides an adequate foundation for holding the President's Order unlawful and further enjoining its enforcement. The majority scarcely addresses these points, preferring instead to hold that the President may implement any policy or directive, however related or unrelated to the true purposes of the 1949 Act, as long as his action is consistent with what the majority describes as the "not narrow" concepts of "economy" and "efficiency." The majority finds in two respects a "sufficiently close nexus" between these two concepts and Executive Order 12092.

1. The Direct Impact of Executive Order 12092.

The majority first appears to reason that Executive Order 12092 will have the direct effect of lowering the federal government's cost of doing business. This is so, the majority contends, because most federal government procurement is done by negotiated contract, and thus any program designed to limit a contractor's ability to raise his prices will likely have an immediate impact on the cost of the contracts the federal government negotiates. In the bid-

ding context, the majority says that even though there may be "occasional instances" when federal government procurement by bid results in a contract award to someone other than the lowest bidder, owing to the President's Order, the federal government will still benefit because the lowest complying bidder might have a bid lower than it would have been in the absence of the guidelines.

There is no support in the record to justify these claims by the majority. The majority makes much of its distinction between negotiated contracts and contracts awarded by bid, perhaps because it simply cannot explain away the fact that Executive Order 12092 is a flat and direct contradiction of the principle that economy and efficiency compels an award of a contract to the lowest responsible bidder, that is, the bidder who, operating on a sound financial foundation, is able to offer the most economical and efficient goods and services. The majority notes in this connection that most procurement contracts are negotiated because the military departments, which dominate federal government procurement, usually negotiates its contracts. It neglects to point out, however, that the rules governing the President's procurement program exempt from coverage not only goods and services essential to the national defense, but also situations in which there is no feasible alternative sources of supply or the application of the program would threaten the contractor's ability to survive, both of which are commonplace in the area of military procurement and both of which are the common circumstances in which a contract would be negotiated rather than let out to bid.

Even assuming that the majority's emphasis on negotiated contracts has some albeit modest validity, the distinction it draws between negotiated contracts and those awarded by bid is meaningless. If there is only one available supplier of the goods or services for which the federal government needs to negotiate, the wage and price guidelines will likely not even apply under the express terms of the procurement program's regulations. Even if they do apply,

the President's program does not enhance the federal government's position at the bargaining table; it just provides that whatever and however high a price the contractor puts forth for the goods or services will not be raised beyond the limits provided in the guidelines.

Far more important is the situation in which there is more than one available supplier of the goods or services for which the federal government needs to negotiate, and here the speciousness of the majority's distinction is obvious. The majority focuses only on the contractor with whom the federal government actually negotiates. This focus permits it to advance the self-fulfilling prophecy that whenever the federal government negotiates a contract under Executive Order 12092 the result will be lowered government costs because the contractor will have to adhere to the President's wage and price guidelines. The crucial point, however, is not with whom does the federal government actually negotiate but with whom can the federal government negotiate under the President's Order in the first place. In the process of screening those contractors with whom it can negotiate and those with whom it cannot, the federal government under Executive Order 12092 necessarily ignores factors like which contractors can offer the best goods or services at the lowest price because its concentration must be solely on which contractors are in compliance with the wage and price guidelines. Interests of economy and efficiency yield to the interest of obedience *vel non* to the President's Order. Thus the same logical defect that infects the bid context exists when negotiated contracts are restricted to those who comply with Executive Order 12092.

The logical defect is that compliance with the President's wage and price guidelines bears at the very best a wholly coincidental relationship to the efficiency with which a government contractor performs his work and the cost at which he offers it. Under Executive Order 12092, procurement contracts do not necessarily go to the lowest responsible bidder or to the potentially low-

est negotiator, but only to bidders and negotiators who first and foremost abide by the President's wage and price standards. Thus, for example, the supplier who is in fact able to provide the most efficient and economical goods or services at the lowest price can nevertheless be disqualified from seeking government contracts because, either voluntarily or by compulsion of a labor strike, he gave his employees a long overdue cost-of-living increase that exceeds the President's guidelines.

Executive Order 12092 is not confined to the government work done by federal contractors but reaches all facets of their business. Hence a prospective government contractor may in fact be in compliance with the guidelines with respect to goods and services he offers the federal government, but may still be precluded from seeking government contracts because his wage and price decisions on nongovernment matters do not comport with the President's "suggestions" about what those decisions ought to be.

Indeed Executive Order 12092 *penalizes* the economical and efficient supplier of goods and services under predictable and common circumstances, thereby undermining the very purposes of the statute on which it professes to rest. Take for instance Supplier A and Supplier B, each of whom produces widgets for sale to the federal government. The cost of producing a widget is the same to each, say, $25. For reasons of their own, the two suppliers operate at very different profit margins: Supplier A charges a modest $26 per widget, leaving a profit of one dollar, while Supplier B greedily charges $30. Under normal conditions, one can safely assume that a federal government procurement officer with a charter to seek the most economical and efficient supplier of widgets would hasten to Supplier A's door. But suppose that after the imposition of the President's guidelines inflation causes a relatively dramatic increase in the costs of producing widgets, say $3 worth. Supplier A cannot survive producing widgets at a loss, so he must increase the cost of his widgets by an amount greater than $2 and

likely by as much as $3. This increase places Supplier A in violation of the guidelines. Supplier B, on the other hand, can absorb the increased costs while still enjoying a profit, and, being greedy, is likely to raise the cost of his widgets by some amount within the guidelines. Despite his increases, Supplier A remains the most economical and efficient supplier of widgets, for his product still costs at least one dollar less than Supplier B's. Nonetheless, under Executive Order 12092, the federal government officer cannot approach his door. Thus the President's Order rewards bidders and potential negotiators with high pre-existing price levels who are able to certify compliance with the President's procurement program while it punishes those potential suppliers with low profit margins who are unable to do so owing to intervening increases in costs.

## 2. The Indirect Impact of Executive Order 12092

Perhaps recognizing the weaknesses inhering in a claim that Executive Order 12092 will have a direct and immediate impact on federal government procurement, the majority retreats to the notion that if the President's Order is ultimately successful in stemming the tide of inflation the federal government's cost of doing business will be correspondingly reduced. This reasoning acknowledges that the President is using the procurement power for something other than a direct procurement objective, *i. e.*, to attempt to curb inflation. This contradicts its earlier conception of the content of "economy" and "efficiency." *See* pp. 789 *supra*. Far more troubling, however, is the exceedingly attenuated character of the nexus between procurement policy and presidential action which the majority deems sufficient. This reading of section 205(a) admits to no boundaries on presidential action but instead permits the President to effect any social or economic goal he chooses, however related or unrelated to the true purposes of the 1949 Act, as long as he can conceive of some residual consequences of the order that might in the long run help

the Nation's economy and thereby serve the "not narrow" and undefined concepts of "economy" and "efficiency" in federal government procurement.

The recent history of our civilization records so many horribles committed in the name of economy and efficiency that it simply defies common sense and sound judgment to suggest that the Eighty-First Congress contemplated delegating power of that scope to the President. It is essential to realize that the validity of a particular presidential order cannot turn on whether we view the action as "good" or "worthy," for the meaning of a statutory delegation of authority cannot vary depending on judicially-conceived policy judgments about the wisdom of the exercise of power in a given circumstance. Likewise the effectiveness of the program must be irrelevant to judicial consideration (though it is noteworthy that part of the evidence the majority cites to show the effectiveness of Executive Order 12092 is the testimony before Congress of one of the defendants in this case, testimony that is daily rebutted by newspaper reports to the contrary). The determination that legislative power was lawfully delegated cannot hinge on whether a court decides that the power as exercised has a chance of accomplishing its objectives. The previous discussion about the lack of direct impact on the procurement process of Executive Order 12092 is only to show that the Order has no relationship to procurement needs, not to show that a clearly procurement-directed policy will not work.

Apparently concerned about the limitless nature of the power the majority describes, two judges within the majority restrict their support by attaching separate concurrences stressing the narrowness of the majority's holding. The majority itself strains to emphasize the proximity of the nexus it approves. But as the majority says, this court's task is to construe a statute, not to endorse a particular program. No number of caveats, no amount of denials, no yells of "Narrow!" can conceal the actual course of reasoning the majority follows.

The shifting nature of the majority's analysis is evident in its use of the prior executive orders allegedly based on the President's section 205(a) powers. I shall turn presently to the value of those orders in determining the scope of the presidential procurement power, but it is useful now to pause on how these orders fit into the majority's interpretation of that power. Since the majority employs—indeed practically rests on—these earlier orders to arrive at its judgment about what constitutes a "sufficiently close nexus," it presumably believes that these orders too are justified purely by resort to section 205(a). But how? The merits of the orders aside, for they are not before us, what conceivable relationship does an affirmative action program requirement have to the federal government's cost of doing business? Perhaps the answer is that such a program will lead to reduced unemployment and thereby occupy some role in improving the Nation's economy. I imagine the answer continues with the argument that this improvement in the economy will in turn have some benefit for the terms and conditions on which the federal government purchases and maintains its goods and services. The turns of logic this reasoning compels and the conjecture propelling them are, I suggest, rampant with possibilities that stagger the imagination.

For example, suppose the President issued an order declaring that federal government contractors could only buy American goods or could only hire American workers. He could offer the same reasoning he uses here to justify those actions. Or suppose, on the same reasoning, the President decided that government contractors must pay a certain minimum wage to their employees. Indeed it is not unreasonable to ask why under the majority's reasoning the President could not direct the Secretary of Commerce to seize control of the oil companies doing business with the federal government. The President could reason that oil, natural gas, and gasoline (much like steel during the Korean Crisis) are crucial to the Nation's economy, and seizure followed by government control

would lead to improved economic conditions, which in turn would engender a lowering of the federal government's cost of doing business. In light of the majority's view, discussed below, that whether or not it is invoked the President's section 205(a) power can spring into action to support any directive he terms related to economy or efficiency, one wonders why the *Youngstown* Court did not uphold the Steel Seizure on the basis of the 1949 Act. If the majority here is taken at its word, it is clearly prepared to uphold such an order relying only on the President's procurement power.

These examples are no different in kind and only slightly different in degree from the exercise of power the President has taken through the vehicle of Executive Order 12092. Plainly there is no difference in the fact that Congress has traditionally exercised authority over minimum wage and the taking of property, for it has played an equally vigorous role in determining if, when, and under what conditions wages and prices could be stabilized. Nor is there any qualitative difference in the nature of the relationship between the 1949 Act's goals as defined (or left undefined) by the majority and the potential residual consequences for the Nation's economy (and from there to the procurement program) of any one of the examples. As noted above, the effectiveness of any program in achieving its objective is outside the scope of judicial consideration, and thus matters of degree are immaterial. That the seizure of oil companies might be a more efficacious tool is surely no basis for finding it unlawful under the majority's approach. Thus nothing in the majority's test militates against the use of the President's section 205(a) powers for these purposes. Nothing in the test preserves the traditional congressional authority over these fields.

Apart from its disclaimers, the majority makes only one substantive effort to limit the reach of its reasoning. Appellees argued here as below that the President's interpretation of section 205(a) would permit him to suspend willful violators of the National Labor Relations Act from seeking government contracts, a provision Congress considered but did not enact two years ago. The majority says that it need not decide that question, but observes that "[t]he approach we take today might raise serious questions about the validity of such an Order." Maj.Op. at p. 793 n.50. But why? The majority ends on that note, so no more than a hint of a limitation emerges. The distinction between the NLRA order and the one under review cannot reside in Congress' failure to adopt the former as positive law, for Congress has similarly avoided the imposition of any program like the one contained in Executive Order 12092. The "approach" the majority takes approves the President's Order on the ground that its provisions might have some incidental consequences for the national economy and thereby ultimately lead to a reduction in the government's procurement costs. It is, however, equally plausible that the NLRA order might have some incidental consequences on the economy by promoting industrial peace and reducing losses due to strikes, and thus also favorably affect the government's cost of doing business. In my judgment, at least a court reviewing the NLRA order would be assured that the President was acting to enhance a clearly and precisely defined congressional policy. This court acts today without any comparable assurance. In fact, it acts in the face of considerable expressions of adverse congressional intent.

It is not necessary to wander beyond the specific context of Executive Order 12092 itself to discover that the majority's reasoning knows no bounds. Although the Executive Order confines its scope to government contractors and their first-tier subcontractors and suppliers, and in any event to contracts in excess of $5 million, these limitations play no role in the majority's analysis. Accordingly under today's ruling the President could immediately extend the guidelines to any contractor or subcontractor regardless of the value of their contract. In addition, because the majority focuses exclusively on the conceivable consequences of the President's action rather than on the conformance of that action with the ex-

pressed purposes of the 1949 Act, there would be no reason why the President could not also immediately require as a condition of doing business with the government that all contractors now covered by his Order refuse to do business with any other entity not in compliance with the President's guidelines. Using only his section 205(a) power, then, the President could in effect impose a secondary boycott on any business that did not accept his wage and price "suggestions." Clearly a conceivable consequence of such an order would be at least a temporary reduction in the government's cost of doing business. And because the President would be using his procurement power rather than imposing a direct "legal obligation" as the majority defines it, such an order would not by the majority's standard amount to forbidden "mandatory" controls.

### D. Congressional Intent on Wage & Price Controls

This last example not only again demonstrates that the majority draws on section 205(a) at Congress' expense to sign a blank check made out to the President, but it also underscores the futility of its efforts to confine the definition of "mandatory controls."

Section 3(b) of the Council on Wage and Price Stability Act of 1974 provides that nothing therein authorizes the "continuation, imposition, or reimposition of *any mandatory economic controls* with respect to prices, rents, wages, salaries, [and] corporate dividends." Act of August 24, 1974, Pub.L. No. 93–387, § 3(b), 88 Stat. 751 (codified at 12 U.S.C. § 1904 note (1976)) (emphasis added). The majority first holds that this provision is inapplicable here because Executive Order 12092 does not establish "mandatory" controls. The majority reasons that the President's guidelines establish no direct legal obligation and threaten no civil penalty for noncompliance. The majority adds that because no one has a "right" to a government contract, the government can qualify its willingness to do business on any condition it pleases. Then the majority holds that in any event

section 3(b) is "irrelevant" to the President's procurement program because it merely represents a guide to the meaning of the Council on Wage and Price Stability Act of 1974 and ergo has no implications for an action premised on the 1949 Act.

It is odd that the majority can rely on the 1979 extension of the Council on Wage and Price Stability Act of 1974 to support its interpretation of section 205(a), but rejects any reliance on the substantive provisions of the original enactment, though the latter established the mechanism the President is using to implement Executive Order 12092. Even recognizing that some restriction should be placed on the intent expressed in a statute, the intent expressed in section 3(b) is not "irrelevant" to our consideration of the President's procurement program. In analyzing what kinds of policies and directives the President can issue pursuant to his procurement power it is useful to examine other congressional enactments to explore whether Congress has expressly or impliedly intended to limit the President's options. Viewing section 3(b) from this perspective, I find inescapable the conclusion that the history of congressional control over and regulation of programs of wage and price stabilization, and especially its recent condemnations of such programs, indicate that Congress did not intend to permit the use of section 205(a) to establish the kinds of wage and price requirements the President has established here.

This conclusion emerges from the consistent pattern, stretching back over more than three decades, of complete and zealously guarded congressional control of wage and price stabilization. It exists in section 3(b) and its legislative history. I find it in Congress' refusal, after careful consideration and thorough debate, to extend the Economic Stabilization Act of 1971, an extension which would have permitted the President to order controls like those imposed pursuant to statutory authority by President Nixon in 1971. I find it in the Senate's adoption last September of a "Sense of the Senate" resolution—concededly not a complete expression of congressional in-

tent—expressing the view that neither the 1949 Act nor any other statute sanctioned the imposition of wage and price standards. I find it in Congress' unequivocal statements that nothing in its recent extension of the Council on Wage and Price Stability Act was to be in any way construed as an endorsement of the President's procurement program. H.R.Rep. No. 96–93, 96th Cong., 1st Sess. 3 (1979) (Conference Report).

The majority seeks solace in the last of this list, reasoning that Congress was by then aware of the President's procurement program and meant to display its approval of the program by extending the statute, tripling the Council's staff, and substantially increasing its budget. With clear and unambiguous statements to the contrary, it is a gross distortion of legislative intent to suggest that Congress' extension of the Council on Wage and Price Stability Act was a *sub silentio* endorsement of the President's procurement program. Even were the expressions of congressional intent less clear, and even were it appropriate to rely on the extension, the extension would still be insufficient to indicate an abrupt abdication of the authority to regulate wages and prices that Congress has so carefully and sparingly used over the past four decades. Similarly, I reject the majority's Rip Van Winkle theory that Congress' failure to overturn the President's program is an implied ratification of it. Congressional inaction does not strip courts of their responsibility to construe statutes. Congress was aware of the grave questions surrounding the President's use of the procurement power to promulgate Executive Order 12092, and it fully expected courts to fulfill their duty to resolve those questions. It is Congress' job to make law; it is the courts' job to say what the law is.

It is obvious to me that the President's procurement program falls within the species of *mandatory* controls that Congress has condemned in section 3(b) and elsewhere, and that therefore the Executive Order contradicts the expressed will of Congress. I arrive at this judgment categorically, without the need to identify what section 3(b) actually prohibits. But even engaging in the kind of semantic exercises in which the majority indulges, I conclude that these controls are "mandatory" in every meaningful sense of that term. We are not analyzing here some abstract notion of constitutional deprivation. We are instead, to borrow the majority's phrase, operating in a "real-world setting." It matters little whether there exists a pristine "right" to a Government contract when the thrust of the President's Order is to deny contractors disobeying the guidelines any *opportunity* even to compete for a government contract. For a program to be mandatory it need not compel every person in the Nation to conform to a particular requirement. It is sufficiently "mandatory" if those within its orbit are compelled to comply with the requirement under the pain of suffering a denial of some benefit that would have been open to them.

Here the President has identified a discrete class of Americans and has imposed on that class a system of wage and price controls by which it must abide at the risk of a sanction far more onerous than a civil penalty. It cannot be doubted that a corporation would prefer to pay a $10,000 penalty for disobeying wage guidelines than to lose a government contract in excess of $400 million. Newspaper accounts have already detailed such sanction being sought. The President is in effect clubbing an identifiable group of Americans into submission, all the while claiming that the blows those Americans so powerfully feel are mere "suggestions." They are not suggestions; realistically, they operate as mandatory economic controls.

### E. Section 205(a) & Earlier Executive Orders

For a variety of reasons I am also unpersuaded by the majority's reliance on previous executive orders allegedly promulgated under section 205(a). First, only two of the majority's examples actually cite section 205(a) as a source of authority, and one of these continued and expanded a long-term congressional policy. *See* 39 Fed.Reg. 24009

(1974). None of the remaining orders make reference to the presidential procurement power in section 205(a). Second, all the remaining orders either had another source of authority *ab initio* or were subsequently ratified by Congress. Executive Order 12092 is in this respect *sui generis*, for it relies only on section 205(a) and has not even impliedly been ratified by any subsequent congressional action. Third, while the majority reasons that those orders not specifically supported must have relied on section 205(a), that conclusion is conjectural. Moreover, it entails a sort of jack-in-the-box theory of presidential procurement power. Apparently whenever a court needs it to play a part in presidential power relating to the imposition of social and economic goals on federal government contractors, section 205(a) can spring up out of the otherwise confined quarters of the 1949 Act to fill the bill.

This leads to a fourth difficulty with the majority's use of the previous orders. Usually when a court defers to an executive agency's interpretation of its own powers, it does so because it finds that a nearly contemporaneous construction of the powers by the executive agency has been consistently applied over time. *See, e. g., Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers*, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); *see* 2A C. Sands, *supra*, § 49.03–.07. There is no such contemporaneous construction here, for none of the orders actually referred to section 205(a). Nor is there a consistent application, for as the majority acknowledges, different orders—indeed, even essentially the same orders—at different times may or may not have been grounded on section 205(a). Thus the ostensible pattern of presidential use of the procurement power the majority seeks to weave is simply not clear enough to indicate what the majority wants to see in it.

Fifth and finally, assuming *arguendo* that the President has in the past invoked section 205(a) to achieve objectives comparable to those sought in Executive Order 12092, that is no basis for concluding that the practice is lawful. No federal court has ever held that section 205(a) alone can support such an order. In *Farmer v. Philadelphia Electric Co.*, 329 F.2d 3 (3d Cir. 1964), and in *Farkas v. Texas Instruments, Inc.*, 375 F.2d 629 (5th Cir.), *cert. denied*, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967), the courts' discussion of the scope of the procurement power was dicta, assumptions employed for the purpose of determining whether anti-discrimination orders presumed to be promulgated in part under section 205(a) created a private cause of action. Both courts held that it did not. In the case on which the majority chiefly relies, *Contractors Association of Eastern Pennsylvania v. Secretary of Labor*, 442 F.2d 159 (3d Cir. 1971), it was simply unnecessary for the court to rely exclusively on the presidential procurement power to uphold an affirmative action plan imposed on federal contractors, and, recognizing as much, the court did not do so.

The majority's attempt to piece together a picture of past executive practices justifying Executive Order 12092 is thus unpersuasive. Indeed I would hold that if the past executive orders are useful at all it is only to show that the presidential action *sub judice* lacks the kind of expressed or implied approval that Congress typically supplies presidential procurement orders that exceed the narrow purposes of the 1949 Act. *Cf. United States v. New Orleans Public Services, Inc.*, 553 F.2d 459 (5th Cir. 1977), *vacated on other grounds*, 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978) (upholding executive order requiring nondiscrimination clauses in federal contracts by noting "implied congressional approval" and suggesting it could "even be argued that there has been express congressional ratification"). Executive Order 12092 not only lacks any indication of congressional approval, it flies directly into the face of recently expressed congressional antipathy for wage and price measures of any kind. *Cf. United States v. East Texas Motor Freight Systems, Inc.*, 564 F.2d 179 (5th Cir. 1977) (congressional policy favoring

protection of *bona fide* seniority plans overrides contrary executive order requiring affirmative action by federal procurement contractors).

### F. *The Delegation Doctrine*

If the presidential procurement power in section 205(a) were construed in a manner faithful to the purposes underlying the 1949 Act no constitutional prescriptions would imperil the congressional scheme. As the majority construes the statute serious constitutional questions arise, for assuming that Congress did indeed intend to grant the President the power to impose mandatory wage and price standards on government contractors, the terms it used to do so do not provide a constitutionally sufficient standard for delegating legislative authority. The close nexus test the majority advances cannot supply an adequate standard. Mere proximity may count in horseshoes and dancing, but adherence to congressionally-prescribed standards is required for valid lawmaking by executive officers.

I agree with the author of the majority opinion that "the reported demise of the delegation doctrine is a bit premature." Wright, *Beyond Discretionary Justice*, 81 Yale L.J. 575, 582 (1972). The Supreme Court invalidated congressional enactments on the grounds of excessive delegation in *Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) and *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). Neither it nor any other federal court has rejected the doctrine. As recently as *National Cable Television Association, Inc. v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), the Court quoted extensively and approvingly from *Schechter*. The Court did not reach the delegation issue in that case, but Justice Douglas' majority opinion cautioned that "the hurdles revealed in [*Schechter* and *Hampton & Co. v. United States*, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928)] lead us to read the Act narrowly to avoid constitutional problems." 415 U.S. at 342, 94 S.Ct. at 1150.

The Supreme Court's approach in *National Cable Television* is a useful touchstone for analysis of the delegation problem here. The statute involved in that case was the Independent Officers Appropriation Act of 1952, 31 U.S.C. § 483a (1976), which as abbreviated and quoted by the Court provides:

It is the sense of the Congress that any work, service, . . . benefit, . . license, . . . or similar thing of value or utility performed, furnished, provided, granted . . . by any Federal agency . . . to or for any person (including . . . corporations . .) . . . shall be self-sustaining to the full extent possible, and the head of each Federal agency is authorized by regulation . . . to prescribe therefor . . such fee, charge, or price, if any, as he shall determine . . . to be fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts . . . .

Acting on this authority, the Federal Communications Commission, in the process of revising fees imposed upon cable television systems, first computed its direct and indirect costs for cable television regulations and then, while retaining filing fees, added an annual fee for each cable television system at the rate of 30¢ per subscriber. On certiorari from a court of appeals' denial of a petition to set aside the Commission's schedule, the Supreme Court reversed.

The issue for the Court was whether the amount of the fee was computed in accordance with the proper standard. One possible standard was the "value to the recipient"; the other was "public policy or interest served." The Court first noted the distinction between taxation, which it described as purely legislative prerogative to be levied more or less arbitrarily without any necessary connection to a particular benefit bestowed by the taxing government, and the imposition of a fee, which it described as an incident to a voluntary request for a benefit bestowed by, for example, a public agency. The Court then carefully noted

what the purpose of the Federal Communications Commission was, namely, to safeguard the public interest in broadcasting. If the Commission were in a position to tax (as opposed to requiring a fee), it would be in effect be charging for the protective services it offered the public.

The Court would not hear of it. Observing that Article I of the Constitution afforded Congress the exclusive power to "lay and collect" taxes, Justice Douglas wondered aloud whether a standard permitting an administrative agency to impose taxes in the name of "public policy or interest served" could pass constitutional muster. In light of the alternative language in the statute and the legislative history indicating the relatively modest scope of what Congress intended agencies to be able to collect, the Court opted to avoid the constitutional obstacles by adopting the narrower standard, namely, "the value to the recipient."

The Supreme Court's approach to statutory construction in *National Cable Television* is applicable here. Certainly no difference exists because that case involved an administrative agency and this case involves the President. The delegation doctrine applies with equal force to both. Moreover, one of the astonishing things about this case is that whatever power the majority grants the President in section 205(a), *a fortiori* it grants the Administrator the same power (in the absence of contrary presidential orders) in section 201. Here as in *National Cable Television* there is a statute that demands a context. Here as in *National Cable Television* there is a power that must derive from and be limited by that context. Here as in *National Cable Television* a broad reading of the statute risks constitutional condemnation while a narrower reading preserves the statute's validity and fully serves the purposes for which it was designed.

The celebrated *Schechter* case on which Justice Douglas relied for his analysis of the delegation question involved a "Live Poultry Code" promulgated by President Roosevelt pursuant to the National Industrial Recovery Act. That statute authorized the President to issue "codes of fair competition" upon a finding, among other things, that such codes would "tend to effectuate the policy of" the statute. Chief Justice Hughes posed the analytical framework for the Court as follows:

[T]he Constitution has never been regarded as denying to Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and established standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which policy as declared by the Legislature is to apply. But . . . the constant recognition of the necessity and validity of such provisions, and the wide range of administrative authority which has been developed by means of them, cannot be allowed to obscure the limitations of the authority to delegate . . . .

Accordingly, we look to the statute to see whether Congress has overstepped these limitations—*whether Congress in authorizing "codes of fair competition" has itself established the standards of legal obligation, thus performing its essential legislative function, or by failure to enact such standards, has attempted to transfer that function to others.*

295 U.S. at 530, 55 S.Ct. at 843 (emphasis added). This same concern with the congressional performance of its legislative role was expressed almost four decades later by the suggestion that Congress should not "be permitted, in effect, to vote itself out of business" through excessive delegation. Wright, *Beyond Discretionary Justice, supra,* at 582.

Within the framework it constructed, the *Schechter* Court focused on whether Congress had given any meaningful content to the term "unfair competition." It noted that the statute did not define the term, nor could the term be defined by any existing body of law. The Court believed that if the President's discretion to impose the codes was circumscribed by some judicially cogni-

zable limits exhibited in the overall congressional enactment or its declaration of policy, then perhaps Congress had indeed performed its constitutional responsibility. But it found no such limits in the statutory scheme, and was thus compelled to conclude:

[The statute] provides no standards for any trade, industry, or activity. It does not undertake to prescribe rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure. Instead of prescribing rules of conduct, it authorizes the making of codes to prescribe them. For that legislative undertaking, [the statute] sets up no standards, aside from the general aims of rehabilitation, correction and expansion . . . . In view of the scope of that broad declaration, and of the nature of the few restrictions that are imposed, the discretion of the President in approving or prescribing codes and thus enacting laws for the government of trade and industry throughout the country, is virtually unfettered. We think the code-making authority thus conferred is an unconstitutional delegation of legislative power.

*Id.* at 541–42, 55 S.Ct. at 848. *Accord, Panama Refining Co. v. Ryan, supra,* 293 U.S. at 415–18, 55 S.Ct. 241.

The majority holds that section 205(a) of the 1949 Act permits the President to prescribe any policy or directive that might have conceivable consequences for the Nation's economy and thereby reduce the federal government's cost of doing business. On that view, Congress did not set down any standards on what kinds of consequences could be produced, or what kinds of facts must be present before the President's authority is triggered. The only terms in the statute confining the President's power are "economy" and "efficiency." The statute does not define those terms, nor does the majority's reading relate them to a preexisting and judicially cognizable body of law. Because the majority imposes only the most distant requirement of a nexus on presidential behavior, the President's discretion is virtually unfettered. In short, I see

no difference between the vices the *Schechter* Court saw in the NRA and the reading of section 205(a) the majority adopts.

Whether or not the President happens to act on a praiseworthy course or whether he does so effectively are matters outside the judicial competence to assess. Coupling this with the majority's inability meaningfully to delimit the power it approves raises the question whether a court can perform *its* function of ensuring executive compliance with legislative will. This is the concern permeating the Supreme Court's analysis of delegation in *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). In that case, the Court dealt with whether Congress had unconstitutionally delegated legislative power to the executive branch when it enacted the Emergency Price Control Act, Act of Jan. 30, 1942, ch. 26, 56 Stat. 23, *as amended by* The Stabilization Act of 1942, chap. 578, 56 Stat. 765. That statute created the Office of Price Administration, and authorized the Administrator to promulgate regulations and orders fixing prices and rents. *Id.* §§ 2, 201; *see* 321 U.S. at 419, 64 S.Ct. 660. In upholding the delegation of authority, Chief Justice Stone declared that the separation of powers doctrine does not

deny to Congress the power to direct that an administrative officer properly designated for that purpose have the ample latitude within which to ascertain the conditions which Congress has made prerequisite to the operation of its legislative command. . . . [T]he only concern of the courts is to ascertain whether the will of Congress has been obeyed. This depends not on the breadth of the definition of facts or conditions which the administrative officer is to find but upon the determination whether the definition sufficiently marks the field within which the Administrator is to act so that it may be known whether he has kept within it in compliance with the legislative will.

321 U.S. at 426, 64 S.Ct. at 667–668.

The *Yakus* Court fully analyzed the Emergency Price Control Act and carefully

weighed the judicial ability to guarantee that the administrative officers stayed within the zone of the discretion Congress meant to delegate. *See id.* at 423–27, 64 S.Ct. 660. Here the majority does not deal with the statute. Instead it palms the delegation issue in a footnote. Maj.Op. at p. 793 n. 51. The thrust of the footnote is that because the courts can test whether the President's agents are executing the *President's* program in an arbitrary and capricious manner, no constitutional difficulties arise. But that has little to do with the delegation doctrine. The question is not whether a court can assess the compliance of an executive's actions with executive branch policies, but whether it can determine executive conformity with *legislative* branch policies. *Schechter* and *Yakus* each referred to the kinds of standards *Congress* imposed on the President and his agents; they did not focus on the standards the President promulgated. Indeed to even speak of a President formulating policies to be obeyed presupposes the existence of lawfully delegated legislative power. The majority skids over any effort at determining whether the delegation was in fact lawful and reduces the inquiry to a commonplace examination of administrative behavior under the Administrative Procedure Act. That approach reads the separation of powers principles out of the Constitution, something the Supreme Court refused to do as recently as 1974.

Nothing in Judge Leventhal's opinion in *Amalgamated Meat Cutters & Butcher Workmen v. Connally*, 337 F.Supp. 737 (D.D.C.1971) (three-judge court), warrants resort to the analysis the majority elects. It is noteworthy that *Amalgamated Meat Cutters* was decided before *National Cable Television*, and thus did not have the benefit of the Supreme Court's most recent treatment of the delegation doctrine. Nevertheless, Judge Leventhal observed that constitutional mandates required Congress to articulate "some intelligible principle" to permit a court to determine whether the executive officer was in compliance with congressional intent. 337 F.Supp. at 746 (quoting *Hampton v. United States*, 276

U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928)).

In upholding the Economic Stabilization Act of 1970 as a lawful delegation of lawmaking authority, Judge Leventhal took pains to note, among other things, (1) that the statute only gave the President the authority to fix prices and wages within limits, (2) that the President was precluded from "singling out" a special sector of the economy for treatment absent a specific and congressionally-dictated finding of certain circumstances and conditions, (3) the clear and unambiguous congressional purpose to afford the President the power to impose wage and price controls, (4) the "reasoned analysis" by Congress on why it chose to leave the precise timing of the controls to the President, and (5) and the exceedingly limited duration (approximately six months) of the President's power to impose the controls.

How these elements of the program under review "compare favorably" to the detailed approach taken by the *Amalgamated Meat Cutters* I am at a loss to explain. The majority's holding, in what appears to me to be a direct repudiation of Judge Leventhal's reasoning, permits the President to invoke section 205(a) to impose price and wage levels of his choosing on a special sector of the economy he has singled out without any congressionally-required finding, and to maintain those wage and price levels in effect for an unlimited duration, even though, again, there is not the slightest indication that Congress so intended him to act and a substantial number of signs that it intended the contrary.

Concern both with whether Congress has performed its function and with whether a court can perform its function heavily favors a narrow reading of the 1949 Act under the principle that statutes should be construed in a way faithful to constitutional requirements. The majority refuses to apply that principle, and I would hold that the reading of section 205(a) it produces results in a statute lacking constitutionally adequate standards.

### G. Conclusion

My failure to address arguments advanced by appellees in support of the district court judgment is not meant to convey my disagreement with those contentions. Rather because I find the Executive Order 12092 to be illegal on one ground, I believe that it is unnecessary to go elsewhere. Before today's ruling I would have thought it hornbook law that a delegated statutory power is circumscribed by the purposes of the statute which occasion it. I also would have thought that when a statute made the exercise of a power contingent upon consistency with other provisions of the same statute, an exercise of the power that was in fact inconsistent would be deemed unlawful. The flaw in the majority's reasoning does not solely lie in its failure to show any direct relationship between Executive Order 12092 and the purposes of the 1949 Act. Far more perilous is its willingness to read section 205(a) of that statute as a sweeping and unlimited invitation to the President to establish any policy he wants to impose on federal government contractors as long as he can proffer some remote connection between that policy and the price the federal government pays for its goods and services. And under the majority's reasoning it matters for naught that the policy he implements infringes on a territory long preserved by Congress to itself and contradicts oft-expressed indications of contrary legislative intent. The majority also achieves this result by ignoring both the well-established rules of statutory interpretation and the fundamental principles of separation of powers.

The majority concludes its opinion by stating that "Congress has authorized the President to issue wage and price standards and to encourage voluntary compliance as an act of good citizenship." I have no doubt that the President possesses the inherent power to issue wage and price guidelines and to urge voluntary compliance with same as a matter of moral suasion. He can promote adherence to his suggestions as an act of good citizenship just as he can encourage jogging as a way to good health. Furthermore I do not doubt that Congress can make his wage and price guidelines into binding law, or can within limits delegate to the President the power to do so himself. The problem is that Congress has chosen neither course here, and has expressly stated that its acts are not to be construed as indicating otherwise. The result is that the President is exercising legislative authority far beyond that delegated to him by Congress in the 1949 Act.

It is said that hard cases make bad law, and I can only append to that statement the observation that expedited hard cases do not improve the quality of the product at all. I respectfully dissent.*

### APPENDIX

[3195–01–M]

Executive Order 12092          November 1, 1978

### PROHIBITION AGAINST INFLATIONARY PROCUREMENT PRACTICES

By the authority vested in me as President and as Commander in Chief of the Armed Forces by the Constitution and statutes of the United States of America, including Sections 2(c) and 3(a) of the Council on Wage and Price Stability Act as amended (12 U.S.C. 1904 note and Section 205(a) of the Federal Property and Administrative Services Act of 1949, as amended 40 U.S.C. 486(a)), and in order to encourage noninflationary pay and price behavior by private industry and labor, and to provide for the procurement by Executive agencies and Military Departments of personal property and services at prices and wage rates which are noninflationary, it is hereby ordered as follows:

1–101. The Chairman of the Council on Wage and Price Stability shall:

---

\* On the majority's final footnote 65 I add these points: The majority overlooks the fact that the Supreme Court has consistently held that the failure of Congress to revise a statute in the face of an interpretation by executive officers is a poor indication of legislative intent. *E. g.,*

*Zuber v. Allen*, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); *see* 2A C. Sands, *supra* § 49.10. As I point out above, Congress did indeed express its approval of the substance of the earlier executive orders with other statutes.

(a) Monitor company pay and price practices in order to determine compliance with the standards set forth in Section 1–102 of this Order;

(b) Promulgate regulations and guidance to further define these standards, and provide for appropriate exemptions and exceptions;

(c) Publish, or cause to be published, in accordance with procedures designed to ensure fairness and due process, the names of individuals or companies which are not in compliance with the standards;

(d) Promulgate procedures to be used in proceedings before the Council on matters pertaining to the standards, and take such other action as may be necessary and consistent with the purposes of this Section.

1–102.  Noninflationary wage and price behavior shall be measured by the following standards:

(a) For prices, noninflationary price behavior is the deceleration by companies of their current rate of average price increase by at least 0.5 percentage points from their historical rate of annual price increase during 1976–1977 except where profits have not increased.

(b) For pay, noninflationary pay behavior is the holding of pay increases to not more than 7 percent annually above their recent historical levels.

(c) These standards, which shall be further defined by the Chairman of the Council on Wage and Price Stability, shall be subject to certain limitations and exemptions as determined by the Chairman.

1–103.  In order to ensure economy and efficiency in government procurement, the head of each Executive agency and Military Department shall ensure that their con-

tracts incorporate, on and after January 1, 1979, a clause which requires compliance by the contractor, and by his subcontractors and suppliers, with the standards set forth in Section 1–102 of this Order.

1–104.  Each Executive agency and each Military Department shall comply with the directions of the Administrator for Federal Procurement Policy who, in accord with Section 6 of the Office of Federal Procurement Policy Act (41 U.S.C. 405), shall be responsible for the overall direction of the implementation of Section 1–103 including the issuance of regulations and procedures for determining exceptions and granting exemptions.

/s/  Jimmy Carter

THE WHITE HOUSE

*November 1, 1978.*

[FR Doc. 78–31327 Filed 11–1–78; 4:49 pm]

ROBB, Circuit Judge, dissenting:

I would affirm the judgment of the District Court.  Because of the constraints of time I state my reasons only briefly.

I.

At the oral argument in this court counsel for the government rightly conceded that "[i]f the court were to conclude that these guidelines [established by the Executive Order] were an exercise of mandatory economic controls within the  .   .   .  full meaning of that term  .   .   .  the government would lose."  In. my opinion the government does lose, because the guidelines are mandatory.  Contractors who fail to comply are threatened with the loss of contracts for the payment of millions, perhaps hundreds of millions of dollars.[1]  No amount of sophisticated or metaphysical

---

**1.** "The federal government is a major purchaser of goods and services and has direct procurement relationships with most major American industries.  Currently, the total value of federal purchases is approximately $110 billion annually.   .   .   .   "The certification requirements for federal procurement under the OFPP Policy Statement apply to contracts in excess of $5 million.  This threshold includes approximately 50 percent of all procurement dollars.

The actual percentage is approximately 65 to 70 percent because many of the companies must certify compliance for contracts exceeding $5 million also routinely bid on small contracts."  Affidavit of James D. Currie, Acting Administrator for Federal Procurement Policy and acting head of the Office of Federal Procurement Policy, Office of Management and Budget, Executive Office of the President. (App., Vol. 3, pps. 648, 649)

argument can convince me that compliance under threat of such massive economic sanctions is voluntary.[2] Accordingly, I think the government must fail on this ground alone.

## II.

The majority concludes that the compliance program is voluntary. With this finding as a premise the majority rests its case on the Federal Property and Administrative Services Act of 1949. 40 U.S.C. § 471 *et seq.* (Act of June 30, 1949, P.L. 81–152) (the Federal Property Act). This Act established the General Services Administration, headed by an Administrator. In particular the majority relies on section 205(a) of the Act, 40 U.S.C. § 486(a) which provides that "The President may prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act, which policies and directives shall govern the Administrator and executive agencies in carrying out their respective functions hereunder." The majority concludes that the wage and price guidelines prescribed in this case are policies and directives not inconsistent with the provisions of the Act and may be deemed necessary to effectuate its provisions. This conclusion is derived from (1) section 2 of the Act, 40 U.S.C. § 471, which, says the majority, "[sets forth the goal of] an 'economical and efficient system for . . . procurement and supply' ", and (2) section 201, 40 U.S.C. § 481, which "directs that the Administrator of General Services chart policy and procure supplies in a manner 'advantageous to the Government in terms of *economy, efficiency,* or service, and with due regard to the program activities of the agencies concerned.' "

Careful analysis of the Federal Property Act demonstrates, I think, that the purposes of the Act and the policies and directives which it contemplates have nothing whatever to do with the fixing of wages and prices by executive authority. The purpose of the Act is to create efficient machinery for the procurement and management of government property; it is not even remotely concerned with the use of procurement authority to accomplish social and economic objectives.

The purpose of the Federal Property Act is stated in general by its title "AN ACT To simplify the procurement, utilization and disposal of Government property, to reorganize certain agencies of the Government and for other purposes." The origin and purposes of the Act were fully explained on the floor of the House by Representative Holifield, floor manager of the bill. 95 Cong.Rec., 81st Cong., 1st Sess. p. 7441 *et seq.* Mr. Holifield pointed out that the bill was based on the recommendations of the Commission on Organization of the Executive Branch of the Government, popularly known as the Hoover Commission. The intention of Congress said Mr. Holifield, was to coordinate the supply and procurement activities of the federal government:

> The Federal Government needs immediately a comprehensive, workable plan for property management. This plan, had it been established in the past, would have returned enormous savings to the Federal Government through the elimination of competition by the executive agencies for the same articles in the same markets, by prudent buying, and including quantity purchases. This is made even more glaringly apparent when we consider that losses to the Government are particularly acute when one agency has purchased new articles while at the same time, another agency in the Government has been disposing of the same articles by sale at low prices or storing same in their basements. There is a definite need for a clearing house of information as to goods on hand and usable. In the role of the General Services Administration, we see this defect cured. Through lack of central coordination, waste and losses have occurred in the field of ware-

---

2. The government cites *United States Brewers Ass'n, Inc. v. EPA,,* 600 F.2d 974 (D.C.Cir. 1979). In that case however the statute made compliance with the EPA guidelines by federal executive agencies mandatory. 42 U.S.C. § 3256(e) (1970).

housing and other space utilization. Appearing before our committee, the former Federal Works Administrator, General Fleming, said that the Department of Agriculture paid $4,000,000 a year rent to store wool in private buildings in the New England area. While at the same time in this particular area, there was enough empty, available, warehouse space, owned by the Government, which might have been pressed into service for this purpose.

95 Cong.Rec. 7442.

Turning to what became section 205(a) of the Act, Mr. Holifield explained that because "property management affects every executive agency . . . the bill expressly authorizes the President, himself, to prescribe policies and directives, and specifies that these Presidential policies and directives shall govern—not merely guide—not only the Administrator but all executive agencies in carrying out these . . . functions." *Id.* at 7441. In other words Congress intended the President to exercise his authority to assure that uniform policies and methods would be adopted by the various procurement agencies. This is the plain and reasonable explanation of section 205(a). There was no intention to authorize the President to enact economic controls by executive fiat.

The majority argues that regulation of wages and prices is an appropriate step in achieving "the goal of an 'economical and efficient system for . . . procurement and supply.'" The majority says this "goal" is specified in the congressional declaration of policy in section 2 of the Act, 40 U.S.C. § 471.

When the few words excerpted from section 2 by the majority are read in the context of the rest of that section it is apparent that the economy and efficiency to which Congress refers are related to the activities and functions described by Mr. Holifield in his explanation of the bill, that is to the housekeeping functions and activities of the federal government. Thus the section states the intention of Congress to provide for economy and efficiency not only

with respect to contracting, but also with respect to "inspection, storage, issue, specifications, property identification and classification, transportation and traffic management . . . repairing and converting, establishment of inventory levels, [and] establishment of forms and procedures." *Id.* I detect no intimation in this plain statement of purpose that Congress intended to authorize wage and price regulation by executive order. If Congress had intended any such authorization I think it would have said so. I agree with the conclusion of the district judge, expressed in his opinion, that

the Congress has always occupied the field of wage and price controls. Delegation of mandatory control power as well as the standards and means by which controls may be instituted has been carefully limited. On the few and extraordinary occasions when controls have been found necessary, Congress has granted such authority expressly, by positive legislation limited both in scope and particularly in duration. This consistent treatment of controls through specific legislation precludes any inference that Congress has intended to confer control authority by implication.

(P. 98)

The government's argument in this case illustrates and emphasizes the need for specific congressional authorization for price and wage regulation. Carried to its logical end that argument means that the executive's power to regulate industry and business is limited only by his judgment as to what will promote economy and efficiency in the government. I cannot believe that Congress ever contemplated or intended such an extension of executive power.

### III.

The majority cites other executive actions taken in the past under the purported authority of the Federal Property Act. As the majority acknowledges however many of these actions were subsequently validated by legislation, others have never been challenged. In any event I think an argu-

ment based upon these precedents is a weak reed. That executive orders in the past may have stretched or exceeded statutory or constitutional limitations does not mean that the order in this case is valid.

### IV.

Section 3(b) of the Council on Wage and Price Stability Act, 12 U.S.C. § 1904 note, provides:

> Nothing in this Act . . . authorizes the continuation, imposition, or reimposition of any mandatory economic controls with respect to prices, rents, wages, salaries, corporate dividends, or any similar transfers.

The government says this statute is irrelevant to the case before us because the authority for requiring government contractors to meet wage and price standards derives from the Federal Property Act, not from the Council on Wage and Price Stability Act, and because in any event the wage-price standards are not mandatory wage and price controls.

As I have said, I am not persuaded by the argument that the wage and price controls are voluntary. Nor do I agree that the Council on Wage and Price Stability Act is entirely irrelevant to our case. True, the wage and price controls do not rely upon the Act. Nevertheless the language and history of that Act strongly suggest that Congress disapproved the reimposition of wage and price controls. Furthermore, it is a fair inference from this Act that Congress believed that there was no other statute which authorized the imposition of such controls by the Executive.

I respectfully dissent. I am authorized to say that Judge WILKEY joins in this opinion.